Donald CORRIGAN, et al.,
Plaintiffs–Appellants,

v.

CITY OF NEWAYGO, et al.,
Defendants–Appellees.

No. 93–2416.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 8, 1994.

Decided June 7, 1995.

**1212**

Kary Love (argued and briefed), Holland, MI, for plaintiffs-appellants Donald Corrigan, James Stroven, Michael Cook, Wayne Bumstead.

Stanley J. Stek (argued and briefed), Clary, Nantz, Wood, Hoffius, Rankin & Cooper, Grand Rapids, MI, for defendants-appellees City of Newaygo, Charlene A. Corrigan, in her official capacity as City Clerk for City of Newaygo.

Before: MERRITT, Chief Judge; NELSON and DAUGHTREY, Circuit Judges.

MERRITT, C.J., delivered the opinion of the court, in which DAUGHTREY, J., joined. NELSON, J. (pp. 1218–19), delivered a separate dissenting opinion.

MERRITT, Chief Judge.

This case is a constitutional challenge to a ballot access provision adopted by the City of Newaygo, Michigan. The provision prevents residents of the City who are delinquent on their local taxes or water and sewer fees from appearing on the ballot in elections for local offices. Two of the plaintiffs in this case attempted to run for mayor and city council respectively in 1993. The town clerk found that at the filing deadline they had not paid their local taxes and refused to place their names on the ballot. The other two plaintiffs are registered voters in the City and now claim they were denied the opportunity to vote for the two candidates whose names were not placed on the ballot in 1993. All four plaintiffs now claim that the City ordinance which prohibits otherwise eligible candidates from appearing on the ballot if they have not paid their local taxes or water and sewer assessments violates their rights of freedom of association and Equal Protection under the First and Fourteenth Amendments to the United States Constitution.

The case raises two issues. First, we must determine whether this case is moot. The election has now long passed, and both potential candidates have now paid their delinquent taxes. Nonetheless, we find that this is a case "capable of repetition, yet evading review," and therefore appropriate for consideration on the merits. Second, when we turn to the merits of the case, we are faced with a less-than-clear line of Supreme Court precedent dealing with ballot access cases and a case from the Third Circuit holding a similar ordinance unconstitutional. The District Court refused to grant the preliminary injunction requested by the plaintiffs and entered a final judgment shortly thereafter. For the reasons set out below, we now affirm.

## I. Facts

The four plaintiffs, Donald Corrigan, James Stroven, Michael Cook and Wayne Bumstead are qualified voters in the City of Newaygo, a home rule city with 1,484 residents. In May 1993, residents of the city, including Corrigan and Stroven, were involved in an attempt to recall the mayor, Thomas Kowalski. Kowalski resigned before a recall election could be held.

In May 1993, Cook submitted a petition to run for the office of mayor, and Bumstead submitted a petition to run for city council. Both men were former members of the city council and had been active in city politics for some time. The deadline for filing petitions to appear on the ballot was May 11. Both Cook and Bumstead met that deadline. On May 14, the City Clerk notified both men that they had outstanding obligations to the City, and therefore could not have their

names placed on the ballot.[1] The Clerk based her determination on a section of the Newaygo City Charter that provides: "No person shall be eligible for any elective or appointive City office who is in default to the City." Newaygo City Charter § 5.4(b). Cook owed $372.63 in delinquent property taxes and $48.67 in water and sewer charges to the City. Bumstead owed $318.33 in past due property taxes to the City. Both Cook and Bumstead paid their obligations in full before the election, although because the filing deadline had passed they remained ineligible to appear on the ballot. Thomas Kowalski, the mayor who had resigned under pressure, was the only candidate who appeared on the ballot for mayor.

Cook allegedly defaulted because he did not have sufficient funds to pay his taxes (which included an additional sum for state property taxes). He claims his water assessment was only eleven days overdue at the May 11 filing deadline. Bumstead asserts that he did not know that he had not paid the property taxes. The land on which the taxes were levied was under a land contract to his son that provided that his son would be responsible for paying the taxes. Bumstead states that he incorrectly assumed his son had paid the taxes, but admits that because he still held title to the property, he had the ultimate responsibility for paying the taxes.

## II. Mootness

The City contends that we should not reach the merits of this claim because the case has become moot. It argues that the election has already taken place without either Cook or Bumstead on the ballot and therefore injunctive relief would not be possible. Furthermore, the City argues that both potential candidates have now paid their arrears so that there is no reason to expect that they will be excluded from any future elections.

█ As the Supreme Court has noted, in order to avoid mootness "[t]he usual rule in federal cases is that an actual controversy must exist at stages of appellate or certiorari review, and not simply at the date the action is initiated." *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973). Even when an actual controversy does not exist, an appellate court may appropriately adjudicate an issue when it is one that is "capable of repetition, yet evading review." *Id.; Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972); *Moore v. Ogilvie,* 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969) (a case is not moot when it creates a "continuing controversy").

In *Blumstein,* the Court addressed the mootness of case in which the plaintiff had been denied the right to vote under a durational residency requirement. By the time the case reached the Supreme Court, the candidate had already fulfilled the requirement and thus would not be kept off the ballot again under the statute. Nonetheless, the Court held the case was not moot because "the laws in question remain on the books, and Blumstein has standing to challenge them as a member of the class of people affected by the presently written statute." *Blumstein,* 405 U.S. at 333 n. 2, 92 S.Ct. at 998 n. 2. The *Blumstein* Court reached this conclusion even though the case was brought by only one plaintiff and not as a class action. The rationale used in *Blumstein* resembles the reasoning used in *Roe* to hold that case "capable of repetition, yet evading review." The *Roe* Court observed both that a woman could be become pregnant more than once, and that "in the general population, if man is to survive, [pregnancy] will always be with us." *Roe,* 410 U.S. at 125, 93 S.Ct. at 713. In other words, the Court held that the *Roe* plaintiff could represent the class of people who might become pregnant in the future and be subjected to the Texas statute restricting abortions.

This case is not moot with respect to the two voters, Corrigan and Stroven. We have every reason to expect that ordinance will be

---

1. The Newaygo City Charter provides:
   Within three days after the last date for filing petitions, the Clerk shall make his final determinations as to the validity and sufficiency of each nominating petition and whether or not the candidate has the qualifications required for his respective elective City office by this Charter ...
   Newaygo City Charter § 4.10(b).

enforced again in a future election. Furthermore, the defendant's refusal to place Cook and Bumstead on the ballot, which denied Corrigan and Stroven the chance to vote for them, could not be fully litigated before the election had passed. There is a reasonable expectation that future candidates for whom Corrigan and Stroven wish to vote will be denied a place on the ballot under the ordinance. Thus with respect to the voters, this case is capable of repetition, yet evading review.

In addition, with respect to the candidates this case resembles *Blumstein* very closely. Like the plaintiff in *Blumstein* who had fulfilled the durational residency requirement, Cook and Bumstead have now paid their taxes. But, the *Blumstein* plaintiff and the candidates in this case both have standing as members of the class of people who would be affected by the statutes in the future. To hold this case moot would require the absurd result that a court would never be able to rule on the Newaygo ordinance. No candidate barred from the ballot under the ordinance would ever be able to litigate fully a case in the time between the filing deadline in Newaygo and Election Day. Unless a candidate were willing to remain in default for several years, he could not demonstrate convincingly that the ordinance might ever be applied to him again. Therefore, the town

could repeatedly apply the ordinance to different candidates, none of whom could ever challenge it in court.[2]

## III. The Merits

■ The Supreme Court has made clear that a candidate does not have a fundamental right to appear on the ballot. *Bullock v. Carter*, 405 U.S. 134, 142–43, 92 S.Ct. 849, 855–56, 31 L.Ed.2d 92 (1972). Nonetheless, "[t]he impact of candidate eligibility requirements on voters implicates basic constitutional rights." *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). Consequently, "the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." *Bullock*, 405 U.S. at 143, 92 S.Ct. at 856.

### A. Freedom of Association

■ In *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), the Supreme Court advised us that in general there are two types of freedom of association protected by the Constitution.[3] One type of freedom of association is related to privacy and is protected by the due process clause—for example the freedom of as-

---

**2.** The dissent would have us hold this case moot based on the argument that there is no "reasonable expectation" that the statute might be enforced again. Clearly, those residents of the town who voted for the ordinance in the local referendum viewed the matter differently. If they believed that no candidates for local office would ever be tax-delinquents, and therefore that the ordinance would never be violated or enforced, there would have been no reason for them to enact it. Furthermore, we note that in the Third Circuit a very similar ordinance was enforced and gave rise to a lawsuit that resulted in another published appeals court opinion. *See Deibler v. City of Rehoboth Beach*, 790 F.2d 328 (3d Cir.1986). It seems likely to us that if these tax-delinquency ordinances have produced two such cases in nine years, this ordinance may well be enforced again in the near future. Finally, the dissent implies that prior to this case, the Newaygo ordinance was never invoked against any candidate in the twenty-five years since it was enacted. A more accurate statement would be that we do not know whether the ordinance has been invoked in the past because the record is silent on this issue.

**3.** The Court held:

Our decisions have referred to constitutionally protected "freedom of association" in two distinct senses. In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion. The Constitution guarantees freedom of association of this kind as an indispensable means of preserving other individual liberties.

*Jaycees*, 468 U.S. at 617–18, 104 S.Ct. at 3249–50.

sociation on which we base family life and personal friendship—and the second type of freedom of association is a means to another more basic end such as free speech in the political marketplace, the right of voters to cast an informed vote or to form coalitions with other voters. Plaintiffs' claims here have nothing to do with the first type of freedom of association. No form of freedom of association connected to intimate, confidential or personal relationships is asserted.

■ The plaintiffs rely on the means-to-an-end form of freedom of association described in *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). In *Anderson* the Court held: "It is to be expected that a voter hopes to find on the ballot a candidate who comes near to reflecting his policy preferences on contemporary issues.... The exclusion of candidates [can burden] voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying point for like-minded citizens." *Id.* at 787–88, 103 S.Ct. at 1569. In *Anderson*, the Court struck down as unconstitutional an early-filing deadline for independent candidates running for president because it effectively prevented those candidates from appearing on the ballot by placing additional burdens on them. The Court looked to the consequences of the early-filing deadline and found that voters would not be able to vote for candidates who were not nominees of the two major parties and therefore for candidates whose views differed from those advanced by the two major parties.

No such consequences flow from the ordinance in question here. The ordinance does not have the effect of preventing the expression of political views or the forming of groups for this purpose. A person who mistakenly overlooks paying, or cannot immediately pay, local property tax cannot claim to be part of an association or movement when, as here, none of the plaintiffs claim that the taxes were not paid because they were engaging in a tax protest against an unjust law. The tax-paying requirement is a means of collecting taxes, not a means of restricting political speech or the right to vote.

Consequently, the only potential associational interests at stake here would be those of residents who mistakenly failed to pay their taxes or water and sewer assessment, or of those who were unable to do so. (Although Cook claims that he could not pay his taxes because he did not have sufficient funds, he does not claim that the tax rates are too high. Therefore, under a freedom of association analysis, his claim does not differ from someone who mistakenly failed to pay their taxes.) None of the plaintiffs contend that the voters had any particular interest or desire to vote for candidates who failed to pay their taxes because of inability or inadvertence, or even that such candidates represent any particular political viewpoint.

Instead, the plaintiffs argue they form an association based on their opposition to Mayor Kowalski. But the ordinance is not directed at candidates who oppose Mayor Kowalski. If candidates who have failed to pay their taxes inadvertently are also those who oppose Mayor Kowalski, the relationship is purely incidental. We find no reason to believe that the ordinance in question burdens those who oppose Mayor Kowalski, either on its face or in effect. Consequently, we hold that the plaintiffs have asserted no associational interests that would be protected as fundamental rights under the Constitution.

### B. Equal Protection Violation Against Those Unable to Pay

■ Next we consider whether the ordinance denies the plaintiffs' Equal Protection rights. The plaintiffs assert an Equal Protection violation here with respect to Cook, who alleged that he could not afford to pay taxes or water and sewer assessment when they were due. The Supreme Court has struck down excessive filing-fee requirements as violating the Equal Protection clause because of "the obvious likelihood that [the] limitation would fall more heavily on the less affluent segment of the community, whose favorites may be unable to pay the large costs required ..." *Bullock*, 405 U.S. at 144, 92 S.Ct. at 856. *See also Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974). Likewise, the Court has found property ownership requirements un-

constitutional as a bar to ballot access. *See Quinn v. Millsap*, 491 U.S. 95, 109 S.Ct. 2324, 105 L.Ed.2d 74 (1989); *Turner v. Fouche*, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). It is unclear, however, what standard of review the Supreme Court would require us to use to evaluate statutes that may discriminate on the basis of wealth. *Compare Bullock*, 405 U.S at 144, 92 S.Ct. at 856 (holding that statute did not meet rational basis review and therefore no need to consider higher standard of review) *with San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28–29, 93 S.Ct. 1278, 1293–95, 36 L.Ed.2d 16 (1973) (rejecting claim that plaintiffs in that case constituted a definable class but not ruling out possibility that poverty could constitute suspect classification in some instances therefore requiring strict scrutiny review). Nevertheless, we do not have to decide the proper standard of review because this ordinance does not burden the rights of a class entitled to protection under any standard of review.

■ The ordinance here does not preclude a protected class of people from seeking office. The duty of paying taxes and water and sewer assessments is undertaken when a resident chooses to own property. This ordinance does not affect those who may not have sufficient wealth to own property. Nor does the ordinance disproportionately exclude any other group based on a suspect classification. Property owners who are unable to meet the civic obligations they have voluntarily assumed are not a suspect class. Thus, the plaintiffs have asserted no fundamental interests that would entitle them to protection as a suspect class under the Equal Protection Clause.

### C. Equal Protection Violation as an Arbitrary Ordinance

■ The plaintiffs do have a right not to be excluded arbitrarily by the town from appearing on the ballot. This basic protection under the Equal Protection Clause requires the City to provide a rational basis for the restrictions it applies. If the City's restriction "rests on grounds wholly irrelevant to the achievement of a valid state objective" then the ordinance must be struck down

under "rationality review." *Turner*, 396 U.S. at 362, 90 S.Ct. at 541. *See also Quinn*, 491 U.S. at 107 n. 10, 109 S.Ct. at 2332 n. 10. This is true even when the plaintiffs cannot assert any other independent fundamental interest.

In *Deibler v. City of Rehoboth Beach*, 790 F.2d 328, 335–36 (3d Cir.1986), the Third Circuit had before it a similar local ordinance prohibiting a delinquent taxpayer access to the ballot as a candidate. Plaintiff, who had founded a local tax protest group, was denied access because he was a delinquent taxpayer. After upholding the ordinance on the freedom of association grounds, the Third Circuit, in a divided decision, struck the ordinance on Equal Protection grounds as irrational and arbitrary. The court held that the reasons given by the city as the basis for the ordinance—screening out candidates who would harm "public respect for city government" and those who lack "the necessary commitment to the well-being" of the community—are not "rationally served" by the ordinance. The court said that delinquent taxpayers may be just as upright in "commitment" and just as able to inspire "respect" for the local government as others.

In this case, the City has put forward the same "commitment" and "public respect" justifications asserted in *Deibler*, as well as one other: that the ordinance protects the integrity of the City's decision-making process with respect to taxation. It argues that candidates who are delinquent in their taxes cannot be trusted to make responsible tax policy decisions. Whatever may be said about the "commitment," "public respect," and "integrity of the decision making process" arguments put forward by the City, this ordinance does serve the economic purpose of enforcing the City's tax regime. It provides incentives to those citizens who wish to run for office to pay their taxes. Furthermore, it punishes those who do not fulfill their obligations to the City by not allowing them to run for public office in Newaygo. In *United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982), the Supreme Court held that government entities have a significant interest in administering the tax system. Lee was an Amish farmer and car-

penter who claimed that paying social security taxes and receiving social security benefits violated his religion. Therefore, he argued that he should be exempt from paying social security taxes under the Free Exercise Clause. The Supreme Court rejected this argument holding that "the tax system could not function if denominations were allowed to challenge the tax system because tax payments were spent in a manner that violates their religious beliefs. Because the broad public interest in maintaining a sound tax system is of such a high order, religious belief in conflict with the payment of taxes affords no basis for resisting the tax." *Id.* at 260, 102 S.Ct. at 1057 (citations omitted). Consequently, the Court ruled that ensuring the functioning of the tax system was, in that case, "essential to accomplish an overriding governmental interest." *Id.* at 257–58, 102 S.Ct. at 1055.

In this case, the City's interest in encouraging its citizens to pay taxes through a ballot access restriction must survive "rational basis" review, a much lower standard than the "fundamental right" analysis that the Free Exercise Clause claim requires. It is true that invalidation of the law in *Lee* would provide a much larger group with an incentive to refuse to pay taxes on religious grounds than would invalidation of this ballot access law. But both laws are rationally related to the administration of the tax system. Hence, the ordinance is not an arbitrary restriction, and the plaintiffs' Equal Protection rights have not been violated.

Although we conclude that the ordinance has a rational basis, we do not necessarily disagree with the Third Circuit that the ordinance is not well-tailored to accomplish the other objectives the defendant claims it does. A candidate who may have been delinquent in his taxes or assessments for years can pay his obligations the day before the filing deadline. It is not clear that this person is more suited for office under the City's other justifications for the ordinance than someone who pays one day after the filing deadline. In addition, the City's rationales for the ordinance do not account for those who might be unable to pay their taxes. It is not clear that such a person would lack commitment to the City, fail to engender public respect, or be unfit to fashion the City's tax policies. In light of the existence of one "rational basis" for the ordinance, we need not decide whether these three moral justifications for the ballot access restriction can survive rational basis review.

### D. Ballot Access Weighing

The Supreme Court has stated that a single balancing test should be used in ballot access cases to evaluate freedom of association, equal protection and due process interests:

> [A] court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It must then identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it must also consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Anderson,* 460 U.S. at 789, 103 S.Ct. at 1570. *See also Burdick v. Takushi,* 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). It is unclear whether this means that there is a ballot access potpourri of interests that potentially includes all of the numerous interests protected by the concepts of freedom of association, equal opportunity and privacy, and that all together they should be listed and weighed to see if there is a combination that violates the Due Process, Equal Protection and Free Speech clauses read together. We have sought to view the matter in this way and do not find any interests we have not taken into account in our separate analyses under "freedom of association" and "Equal Protection."

Because the plaintiffs have not enunciated any affirmative rights of association or Equal

Protection that they have been denied, and because we find that the ordinance is not completely arbitrary under rational basis review, the plaintiffs have not been deprived of any rights. Because the defendant does have a minimal interest in tax enforcement at stake in this case, when we balance these interests under *Anderson*, the defendant prevails. Accordingly, the judgment of the District Court is AFFIRMED.

DAVID A. NELSON, Circuit Judge, dissenting.

If I thought we had jurisdiction to decide the merits of this appeal, I would agree with the conclusion that the challenged charter provision is constitutional. I am not persuaded, however, that jurisdiction exists.

This question turns, as the court's opinion recognizes, on the applicability of the "capable of repetition, yet evading review" doctrine. The doctrine requires more than a theoretical possibility that there will be a repetition of the complaining party's grievance; the plaintiff must show a "reasonable expectation" that he or she (or members of the class he or she represents) will be subjected to the challenged action again. See *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 348–49, 46 L.Ed.2d 350 (1975); *Dean v. Austin*, 602 F.2d 121, 123 (6th Cir. 1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980); and *Speer v. City of Oregon*, 847 F.2d 310, 311 (6th Cir.1988), all of which refer to the "reasonable expectation" requirement. See also *Sosna v. Iowa*, 419 U.S. 393, 400, 95 S.Ct. 553, 558, 42 L.Ed.2d 532 (1975), where the Court stressed that "it is *clear* that [Iowa] *will* enforce [its durational residency requirement for plaintiffs in divorce actions] against those persons in the class that appellant sought to represent and that the District Court certified." (Emphasis supplied.)

As far as the two candidates in the case at bar are concerned, the record does not show that either of them is likely to be unwilling or unable to pay his taxes while running for office in the future. We cannot simply assume that having defaulted once, they are likely to default again. See *Honig v. Doe*, 484 U.S. 305, 320, 108 S.Ct. 592, 602, 98 L.Ed.2d 686 (1988), pointing out that the Supreme Court has generally "been unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at risk of [a governmentally inflicted] injury."

As far as the plaintiff voters are concerned, the record does not suggest that the charter provision is likely in future to deprive them of the chance to vote for anyone else they might be inclined to support. The charter provision was in effect for a quarter of a century before it was invoked to keep Messrs. Cook and Bumstead from running for office. It does not appear that anyone who was delinquent in paying his taxes had ever been tempted to enter an electoral race in the City of Newaygo prior to the year in which Cook and Bumstead did so, and I know of nothing in the record to indicate that there is a reasonable expectation that anyone in this situation will be so tempted again. In most places, at least, a candidate's nonpayment of taxes, if made public, is something that could cost him or her votes—and candidates generally find it prudent to avoid alienating potential voters unnecessarily.

Durational residency requirements are different. Ours is a highly mobile society, and there was clearly a reasonable probability that the durational residency requirement involved in *Sosna v. Iowa* would actually keep some people from getting divorced in future years, just as it was clear that the durational residency requirement involved in *Dunn v. Blumstein*, 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), would actually keep some people from voting in future years. The chances are far more remote that future candidates will wish to run for office in Newaygo while in default to the city.[1] It is neither necessary nor appropriate

1. Notwithstanding that Newaygo has fewer than 1500 inhabitants, I agree with my colleagues on the panel that there could again come a time when some Newaygoan might wish to run for office while in default on his taxes. But the fact that something of the same sort happened 14 years ago in a resort town in Delaware (see the case cited in footnote 2 of the court's opinion) does not persuade me that Newaygo is at all

for us to rule on the Newaygo ordinance if the ordinance is not reasonably likely to trip up candidates in the future—and, as far as I can see, the ordinance is not in fact likely to do so. I would dismiss the appeal for want of jurisdiction.

likely to experience a recurrence of this particular problem.

Although it is true that there would have been no reason for the voters of Newaygo to adopt the ballot access provision in the first place if they had not recognized the possibility that tax delinquents might wish to run for office, I do not think it necessarily follows that the voters had a "reasonable expectation" that this situation would actually arise. There are plenty of small towns with election ordinances that have never had to be enforced at all, much less enforced in more than one election season, because no one has ever felt inclined to violate them.