*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0324P (6th Cir.)
File Name: 02a0324p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

LEWELL MARCUM,
        *Plaintiff-Appellant,*

    *v.*

JAMES MCWHORTER, as
interim Sheriff of Pulaski
County, Kentucky,
        *Defendant-Appellee.*

No. 01-5020

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 98-00435—Jennifer B. Coffman, District Judge.

Argued: May 2, 2002

Decided and Filed: September 19, 2002

Before: MARTIN, Chief Circuit Judge; SILER and CLAY,
Circuit Judges.

———————————

## COUNSEL

**ARGUED:** James T. Gilbert, COY, GILBERT & GILBERT,
Richmond, Kentucky, for Appellant. David Whalin,
LANDRUM & SHOUSE, Louisville, Kentucky, for Appellee.
**ON BRIEF:** James T. Gilbert, COY, GILBERT &

1

GILBERT, Richmond, Kentucky, for Appellant. David Whalin, LANDRUM & SHOUSE, Louisville, Kentucky, for Appellee.

SILER, J., delivered the opinion of the court, in which MARTIN, C. J., joined. CLAY, J. (pp. 13-19), delivered a separate opinion concurring in the judgment.

--------------------

## OPINION

--------------------

SILER, Circuit Judge. Plaintiff Lewell Marcum filed this 42 U.S.C. § 1983 action against the late Sam Catron, in his official capacity as Sheriff of Pulaski County, Kentucky ("Catron" or "Sheriff"), alleging that he was fired as a result of his intimate relationship and cohabitation with a married woman in violation of his right of association as guaranteed by the First and Fourteenth Amendments. He appeals the district court's order granting summary judgment in favor of Catron based on its conclusion that his adulterous relationship was not constitutionally protected. For the reasons that follow, we affirm.

### Background

The parties agree that the basic facts in this case concerning the relationship between Lewell Marcum and Rena Abbott are not in dispute. Marcum was hired as a Pulaski County deputy sheriff in February 1986. He separated from his wife on May 8, 1997. Prior to the separation, Marcum lived with his wife and their two children in the martial residence, except for two brief periods in 1996. His divorce was not final until March 11, 1999.

During the course of his work as a deputy sheriff, Marcum met Rena Abbott in 1994 or 1995. When the two met, Abbott was married and living with her husband and their children. From the initial meeting until their cohabitation, Marcum and

whether relationships should be afforded constitutional protection weigh against finding Plaintiff's relationship warrants such protection in the instant case, I concur in the judgment of the Court.

majority opinion, I believe that the short duration of the relationship factors into whether it should be afforded constitutional protection. *Id.* at 620.

Plaintiff's relationship also differs markedly from the type of relationship at issue in *Briggs*, where this Court summarily affirmed the district court's finding that the plaintiff's discharge violated his rights to privacy and intimate association. Plaintiff cannot deny on this record that his relationship with Abbott became a public matter and was intertwined with and affected his job performance. Indeed, we have noted that "[t]he significance of *Briggs* lies in the fact that the officer in that case was dismissed solely because of his living status, without any reference as to how that status could have affected his performance as an officer." *Hughes,* 93 F.3d at 242. Plaintiff met Abbott on the job, where she served as a confidential informant; he was reprimanded for the time he spent with her while on duty; and on at least one occasion shortly before his discharge had a public altercation with his adult daughter over the relationship at his workplace. *Cf. Briggs*, 563 F.Supp. at 587 (noting that plaintiff had performed his duties satisfactorily up until the time of his suspension, and that plaintiff, himself, brought his living arrangements to the attention of his superior).[2]

The Supreme Court has held that there are limits on the types of relationships that might warrant constitutional protection. *Roberts*, 468 U.S. at 619. Although such protection is extended beyond familial relationships, thus far the Court has nevertheless indicated that the relationships most likely to warrant such protection are those that involve "*deep attachments and commitments*" in which one shares, among other things, those "personal aspects of one's life." *Id*. at 619-20. Because I find that the objective factors that the Supreme Court has instructed courts to employ in determining

---

[2] This is not to express an opinion on the ultimate reason for Plaintiff's discharge, as this may be disputed. This is simply to point out that Plaintiff cannot claim on this record that his relationship was a purely private affair that did not affect his duties.

Abbott were just "good friends" whose respective spouses and families were social acquaintances whose association was marked by family outings and get-togethers.

As an informant, Abbott frequently met with Marcum to discuss cases. At some point, at least by June 1996, their relationship had progressed sufficiently to attract the attention of Chief Deputy Swartz, who counseled Marcum about Abbott's visits to his office and the courthouse. The relationship had become the subject of rumors in and around both the sheriff's department and the courthouse. Additionally, Sheriff Catron received numerous complaints concerning Marcum's association with Abbott from employees within his department, as well as persons working at the courthouse and various citizens within the community.

The relationship reached a turning point in September 1997. While on duty on September 4, Marcum informed Abbott that her husband was making passes at her best friend. Abbott asked Marcum to go with her to confront the woman, which he agreed to do. After receiving confirmation of Marcum's information, Abbott moved out of the marital residence and into her brother's cottage where she remained with her children until September 9 or 10. During her stay at the cottage, Abbott discussed with Marcum her inability to rent a place of her own and the possibility of their renting a place together, sharing expenses. There had been no discussion of cohabitation between Marcum and Abbott prior to Abbott's leaving her husband.

The two then rented a townhouse and began living together on September 9 or 10. Marcum testified that they were not contemplating sharing a life together, or anything of that nature when they assumed their cohabitation. Abbott testified that at the time they moved into the townhouse, the arrangement was strictly a roommate type relationship with both paying their share of the costs. Marcum also testified that he and Abbott did not engage in sexual relations until after they moved in together. Abbott's testimony, however, places the date of their first sexual relations on September 5,

the day after she left her husband and prior to her cohabitation with Marcum. Noting this inconsistency, but viewing the facts in the light most favorable to Marcum, the district court found that Marcum and Abbott were romantically involved to some degree when they moved in together.

Regardless of their relationship prior to their cohabitation, it is undisputed that Marcum and Abbott were romantically involved during the time they lived together and certainly at the time of Marcum's dismissal. After learning of this living arrangement, Sheriff Catron told Marcum that either he or Abbott would have to move out. Marcum was discharged on September 19, 1997, upon his perceived failure to comply with Catron's directive. The living arrangement between Marcum and Abbott lasted approximately one month.[1] On October 6, Abbott left to reconcile with her husband. The main reason she cited for leaving was that her oldest daughter did not get along with Marcum. She also testified that Marcum "was getting too serious and [she] just wasn't ready for the relationship."

Marcum filed a 42 U.S.C. § 1983 action for wrongful termination against Sheriff Catron, in his individual and official capacity, alleging that he was fired because of his relationship and cohabitation with Abbott in violation of his constitutional rights. The district court dismissed Marcum's First Amendment claims and his freedom of association claim against Catron in his individual capacity on the grounds of qualified immunity. The only claims which survived were Marcum's freedom of association claim against Catron in his official capacity and his pendent state law claims. The court reserved judgment regarding the freedom of association claim. After extending Marcum time in which to develop the facts about the relationship, the district court concluded that

---

[1] Marcum argues that the ultimate duration of the relationship is not relevant to the determination of whether the relationship was constitutionally protected at the time he was dismissed. We agree with this assertion and, as the discussion will illustrate, the short duration of the cohabitation is not a factor in our analysis.

violative of equal protection a state constitutional amendment that, among other things, repealed existing law that banned discrimination against homosexuals; and noting without reference to *Bowers* that reach of amendment could potentially subject this group to arbitrary discrimination). *But see id.* at 640-41 (contending that state amendment depriving homosexuals of rights was rational inasmuch as Court had held in *Bowers* that from the inception of the country homosexual conduct was a crime) (Scalia, J., dissenting).[1]

In any event, I agree with the majority opinion that Plaintiff fails to show that an assessment of the objective factors of his relationship places it at the end of the spectrum with those relationships that the Supreme Court has found warrant constitutional protection under the First Amendment's right of intimate association. Although Plaintiff's relationship with Rena Abbott involved only two individuals and was sexual in nature, the record does not support the finding that this relationship was entered into and maintained to form deep personal commitments and attachments. *Roberts*, 468 U.S. at 619-20. Rather, in assessing the relationship's purpose, not only were both Plaintiff and Abbott married to other people, but Abbott testified that the purpose of their moving in together was merely intended to be a "roommate type of arrangement." Further, Plaintiff cannot claim that others truly were excluded from the critical aspects of the relationship inasmuch as Abbott left the relationship and the residence she shared with Plaintiff within approximately one month so that she could reconcile with her own husband. Unlike the

---

[1] Nevertheless, the adulterous nature of a relationship is a factor that should be considered in determining whether the relationship should be afforded constitutional protection. The Supreme Court has held that a broad range of relationships exist "that may make greater or lesser claims to constitutional protection from particular incursions by the State." *Roberts*, 468 U.S. at 620. Those relationships the Court has most readily afforded protection generally include those pertaining to marriage and family. *Id.* at 619. As at least one court in this circuit has noted, "adulterous conduct is the very antithesis of marriage and family." *Mecure v. Van Buren Township*, 81 F. Supp. 2d 814, 823 (E.D. Mich. 2000) (citation omitted).

Supreme Court rejected a constitutional challenge to Georgia's sodomy statute. In that case, the Supreme Court explained that although not expressed in the text of the Constitution, the Court has recognized certain privacy rights under the due process clause of the Fourteenth Amendment. *Id*. at 193. Focusing primarily on the sexual act at issue, and giving little or no attention to any other aspects of the relationship between the participants of the sexual act, the Court refused to extend a fundamental right to homosexuals to engage in consensual sodomy. *Id*. at 192. The district court below, and apparently the majority, cite *Bowers* because therein the Supreme Court would not take an expansive view and rejected an invitation to discover new fundamental rights imbedded in the due process clause, i.e., the right to engage in homosexual sodomy. The argument therefore goes that this Court should not expand the right of intimate association to include relationships that might be considered adulterous. However, despite *Bowers*, "the Supreme Court has not definitively answered the difficult question whether and to what extent the Constitution prohibits a state (or state actor) from regulating the private consensual sexual behavior of adults." *Hughes v. City of N. Olmsted*, 93 F.3d 238, 241-42 (6th Cir. 1996). Further, in light of the kind of reasoning suggested by *Briggs*, it cannot be said that a relationship that might be considered adulterous *ipso facto* strips the relationship of all constitutional protection. *Bowers* does not require that we give dispositive weight entirely to one factor-- the adulterous nature of the relationship--and ignore all other factors the Court set forth in *Roberts* and expounded upon in *Rotary* (decided after *Bowers*) in assessing whether a certain relationship should be afforded constitutional protection.

Whatever the perceived reach of *Bowers*, a majority of the Court since *Bowers* has not adopted the position that no matter how unreasonable, any government action taken against consenting adults, whose relationships may involve otherwise permissibly state proscribed sexual activity, such as homosexual sodomy, will survive constitutional scrutiny because of the nature of the adult's sexual activity alone. *See, e.g., Romer v. Evans*, 517 U.S. 620, 630 (1996) (holding

Marcum's extramarital relationship was not entitled to constitutional protection. Accordingly, the court granted summary judgment against Marcum because he failed to prove an infringement of a constitutionally protected right.

### Standard of Review

We review the district court's summary judgment decision *de novo*. *See Watkins v. Battle Creek*, 273 F.3d 682, 685 (6th Cir. 2001). Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, summary judgment is appropriate if a party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### Discussion

Marcum maintains that his exclusive, romantic and sexually intimate relationship and cohabitation with a married woman is entitled to protection under the constitutional right of association and, as a result, the Sheriff could not legally fire him for such behavior. He argues that the district court erroneously dismissed his claim by categorically denying constitutional protection based on its labeling his relationship "adulterous," offending the spirit of the Constitution and ignoring the factors and analysis set forth by the United States Supreme Court.

The two seminal cases defining the right of intimate association that this court must look to for guidance are *Roberts v. United States Jaycees*, 468 U.S. 609 (1984), and *Board of Directors of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537 (1987). *Roberts* explained that the constitutionally protected "freedom of association" has been recognized in the case law in two distinct forms. First, the

Supreme Court has identified "a right to associate for the purpose of engaging in those activities protected by the First Amendment--speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts*, 468 U.S. at 618. Next, the Court has recognized a certain right of intimate association reasoning that "choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty." *Id*. at 617-18. The personal relationship at issue in this case does not involve expressive activity. Rather, this case involves an alleged intrusion by the state into Marcum's intimate human relationship in violation of his right of intimate association.

The Court in *Roberts* expressed that in order to secure individual liberty, it "must afford the formation and preservation of certain kinds of highly personal relationships a substantial measure of sanctuary from unjustified interference by the State." *Id.* at 618 (citations omitted). Without precisely defining every consideration underlying this type of constitutional protection, the Court noted that "certain kinds of personal bonds have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs." *Id*. at 618-19. (citations omitted). The personal affiliations that exemplify the considerations that warrant constitutional protection and suggest limitations on the relationships that might be entitled to constitutional shelter "are those that attend the creation and sustenance of a family," which "are distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.* 619-20 (citations omitted).

To determine the limits of state authority over an individual's freedom to enter into a particular association, it is the task of the court to engage in "a careful assessment of

divided over whether extra-marital sexual activity, including adulterous activity, is constitutionally protected in a way that forbids public employers from disciplining employees who engage in such activity. *Briggs*, 473 U.S. at 910. (White, J. dissenting). Justice White would have granted *certiorari* inasmuch as the case would have given the Court an opportunity to consider "the contours of the right of privacy afforded individuals for sexual matters." *Id*.

The majority opinion correctly notes that the Supreme Court has not restricted the constitutional right of intimate association to relationships among family members. *See Rotary*, 481 U.S. at 545. Further, the Supreme Court has rejected the argument that although public employment may be denied altogether, such employment may be subject to any condition at all no matter how unreasonable. *See, e.g., Pickering v. Bd. of Educ. of Township High School Dist*., 391 U.S. 563, 568 (1968) (citing *Keyishian v. Board of Regents*, 385 U.S. 589 (1967)). For a state to dismiss an individual solely because the relationship in which he or she is involved might be labeled adulterous, may be unreasonable under some circumstances. For instance, under the majority opinion's approach, even a long-term relationship in which the participants have resided together, raised children, and lived essentially as a married couple could be beyond the pale of constitutional protection where one or both individuals, for whatever reason, has never legally terminated a prior marriage, and hence could not remarry. This would hold true under the majority's reasoning despite the fact that such a relationship might certainly "presuppose deep attachments and commitments" in which the individuals "share[] not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of [their lives]." *Roberts*, 468 U.S. at 619-20.

The majority opinion relies heavily on *Bowers v. Hardwick*, 478 U.S. 186 (1986), and notes that the Supreme Court has rejected the proposition that "any kind of private sexual conduct between consenting adults is constitutionally insulated from state proscription." *Id*. at 191. In *Bowers* the

personal or private to warrant constitutional protection, courts may consider size, purpose, selectivity, and whether others are excluded from the critical aspects of the relationship. *See Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 546 (1987); *see also Roberts*, 468 U.S. at 620 (noting that courts may also consider "other characteristics that in a particular case may be pertinent").

The majority opinion holds that the "adulterous nature of the relationship [in this case] does not portray a relationship of the most intimate variety afforded protection under the Constitution." Broadly construed, this holding appears to indicate that regardless of any other factors that might be considered in assessing whether a relationship should be afforded constitutional protection, the only relevant factor in determining whether a relationship should be afforded constitutional protection, in a case like the present, is whether the relationship can be deemed adulterous. I believe that while relevant in making such a determination, the adulterous nature of the relationship alone should not be dispositive. Indeed, precedent from this circuit demonstrates as much.

In *Briggs v. N. Muskegon Police Dep't*, 563 F.Supp. 585 (W.D. Mich. 1983), *aff'd mem.*, 746 F.2d 1475 (6th Cir. 1984), *cert denied,* 473 U.S. 909 (1985), the district court, after a bench trial, found that defendants violated a plaintiff's constitutional right to privacy by terminating and refusing to reinstate him as a police officer for his cohabitation with a woman while they were both married to other people. 563 F.Supp. at 587. The plaintiff contended that the defendants' acts had intruded on his constitutionally guaranteed rights of privacy and association, and the district court agreed. *Id*. at 587.

Although *Briggs* has no precedential value because this Court issued no published opinion, we nevertheless affirmed the judgment of the district court, which found that the adulterous relationship involved in that case warranted constitutional protection. In the dissent from the denial of *certiorari* in *Briggs*, Justice White noted that the circuits were

where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments," taking into consideration factors that may include "size, purpose, policies, selectivity, congeniality, and other characteristics" that may be pertinent. *Id*. at 620. *Rotary* added that while the exact boundaries of this type of constitutional protection were not marked, it is not restricted to relationships among family members. *See Rotary*, 481 U.S. at 545. The Court emphasized that protection is afforded to those relationships that "presuppose deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Id*. (internal quotation marks and citation omitted).

Marcum argues that the district court failed to assess the attributes and qualities of the relationship between him and Abbott. Instead, he contends that the court ignored the factors and analysis set forth in *Roberts* and *Rotary*, and focused exclusively on whether the relationship attends the creation or sustenance of a family. Marcum correctly points out that based on the Court's decision in *Rotary*, constitutional protection is not limited to family relationships. *See id.* The district court, however, noted that relationships afforded this type of constitutional protection are not restricted to those between family members. Moreover, the district court acknowledged the appropriate analysis set forth in *Roberts* and *Rotary* and examined the objective characteristics of the relationship between Marcum and Abbott. While there are relationships other than those between family members that may be afforded constitutional protection, it does not follow that *any* relationship that could be objectively qualified as "intimate" should be protected.

Looking at the factors enunciated in *Roberts*, 468 U.S. at 620, and *Rotary*, 481 U.S. at 545-46, Marcum contends that the court failed to recognize that the association was relatively small - just the two of them; highly selective in the decision to begin and maintain the affiliation; and others were secluded

from the relationship. Based on these objective characteristics and the fact that he and Abbott shared thoughts, experiences and personal aspects of their lives, Marcum argues that the relationship is constitutionally protected under the right of intimate association. Although these factors may weigh in favor of a finding of a protected relationship, we find that the adulterous nature of the relationship does not portray a relationship of the most intimate variety afforded protection under the Constitution.[2]

Marcum claims that the district court erred in finding that the adulterous nature of the relationship in question automatically barred constitutional protection. We disagree. The adulterous nature of Marcum's relationship with Abbott is a fact that must be considered in determining where on the spectrum this relationship lies. *See Roberts*, 468 U.S. at 620 (explaining that objective characteristics of the individual relationship must be considered to determine where that relationship lies on a "spectrum from the most intimate to the most attenuated of personal attachments"). The Supreme Court has set forth factors which may be used in determining whether a particular relationship is constitutionally protected. These factors include: "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent." *Id*. The adulterous nature of the relationship between Marcum and Abbott is an objective

---

[2]Marcum cites a Sixth Circuit case, *Corrigan v. City of Newaygo*, 55 F.3d 1211 (6th Cir. 1995), for the proposition that personal friendships may be protected as a form of freedom of association and, therefore, his exclusive romantic relationship with Abbott is surely protected. The court in *Corrigan*, in its initial discussion of the freedom of association and the two types of claims, noted that one type of association is "related to privacy and protected by the due process clause – for example, the freedom of association on which we base family life and personal friendship." *Id.* at 1214-15. The court, however, did not analyze or discuss how to determine which personal affiliations fall into the category of protected intimate relationships, as such an analysis was irrelevant to the facts of the case which concerned the right to associate for purposes of engaging in expressive activity protected by the First Amendment. In short, *Corrigan* is not factually or legally relevant to this case.

---

---

## CONCURRENCE

---

CLAY, Circuit Judge, concurring. I do not agree with the majority opinion's holding that because a relationship can be labeled "adulterous," it should never receive constitutional protection; but because I believe that Plaintiff fails to show that his relationship constitutes the kind of relationship which the Supreme Court has heretofore afforded constitutional protection, I concur in the judgment.

As the majority opinion points out, the Supreme Court has held that the Constitution protects the right to form and maintain certain intimate personal relationships. *See Roberts v. United States Jaycees*, 468 U.S. 609, 617-18 (1984) (explaining that in certain instances, the Constitution protects the right to form and maintain certain intimate relationships against undue and unjustified state intrusion). In attempting to demonstrate the types of relationships warranting constitutional protection, the Court has looked to those "personal affiliations" that attend to the "creation and sustenance of a family" such as childbirth, raising and educating children and living with relatives. *Id*. at 619. The Court explained that "by their nature" these relationships "involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Id*. at 620. Such relationships are constitutionally protected because of the "realization" that individuals draw emotional enrichment from those with whom they share close ties. *Id*. at 619. Constitutional protection therefore "safeguards the ability . . . to define one's identity that is central to any concept of liberty." *Id*. There is a broad spectrum of relationships between those that are most likely entitled to constitutional protection from state interference, such as close family relationships, and those that are not. *Id*. at 620. To determine whether a particular association is sufficiently

fellow officer is insufficient to render the court's reasoning inapplicable here; the *Mercure* court did not base its decision on the identity of the parties. Futhermore, as discussed previously, the fact that adultery is legal in Kentucky does not automatically create constitutional protection, nor does it change the fact that historically adultery has been considered a crime in many states, including Kentucky. We agree with the *Mercure* court's conclusion that "adulterous conduct is the very antithesis of marriage and family," and that such behavior cannot be compared to any of the "fundamental matters of personal choice that lie at the core of traditional notions of individual liberty." *Id.* at 823 (citation omitted).

Marcum has failed to suggest how his decision to enter into an intimate, sexual relationship and cohabitation with a married woman is a fundamental right deeply rooted in the Nation's history and tradition or implicit in the concept of ordered liberty. Though perhaps unfair, his dismissal did not infringe his right of association as guaranteed by the First and Fourteenth Amendments.

**AFFIRMED**.

characteristic that is pertinent to this case and we find that the district court correctly considered it in determining whether the relationship was constitutionally protected.

Next, Marcum contends that the district court's reliance on *Bowers v. Hardwick*, 478 U.S. 186 (1986), when analyzing the fact that the relationship was adulterous, is misplaced for *Bowers* was concerned primarily with the right of privacy and the asserted fundamental right to engage in homosexual sodomy. Furthermore, Marcum points out that *Rotary*, decided after *Bowers*, did not cite or restate any propositions found in *Bowers* when dealing with the right of intimate association.

The Court in *Rotary* was not examining an intimate sexual relationship between two consenting adults and reliance on *Bowers* for guidance was unnecessary. *Bowers* is extremely instructive in the present case and the fact that the court was addressing another fundamental liberty interest grounded in the right of privacy does not prevent this court from relying on *Bowers* for guidance when determining whether an adulterous relationship between two consenting adults is constitutionally protected as a fundamental element of personal liberty protected under the freedom of association. *See Fleisher v. Signal Hill*, 829 F.2d 1491, 1500 (9th Cir. 1987) (explaining that "[a]s applied thus far in Supreme Court case law, the freedom of intimate association is coextensive with the right of privacy; both the freedom of intimate association and the right of privacy describe that body of rights that protect intimate human relationships from unwarranted intrusion or interference by the state.").

In *Bowers*, the Supreme Court rejected the proposition that "any kind of private sexual conduct between consenting adults is constitutionally insulated from state proscription." *Bowers*, 478 U.S. at 191. Rather, the Court characterized the fundamental liberties recognized in prior decisions qualifying for heightened judicial scrutiny as those that are "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [they] were sacrificed" and "deeply

rooted in this Nation's history and tradition." *Id.* at 191-92 (internal quotation marks and citations omitted). The Court held that neither of these formulations extended a fundamental right to homosexuals to engage in acts of consensual sodomy, noting that sodomy was a criminal offense at common law and was forbidden by the laws of the thirteen states when they ratified the Bill of Rights. *See id.* at 192. Accordingly, it held that a right to engage in this conduct was not deeply rooted in the Nation's history and tradition or implicit in the concept of ordered liberty. *See id.* at 194. Furthermore, the Court expressed its reluctance to "take a more expansive view of our authority to discover new fundamental rights imbedded in the Due Process Clause," observing that "[t]he Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution." *Id.*

*Bowers* is factually analogous to this case in that it evaluates a consensual sexual relationship between two adults and it provides an expansion on the analysis set forth in *Roberts* and *Rotary* for cases dealing with private, sexual relationships. Much like sodomy, proscriptions against adultery have ancient roots. Adultery, though not a crime at English common law, was punishable under the canon law, which was administered by the ecclesiastical courts of England. *See United States v. Clapox*, 35 F. 575, 578 (D. Or. 1888); 2 Charles E. Torcia, Wharton's Criminal Law § 210 (15th ed. 1994). The common law, brought to this country by the American colonists, did not punish adultery unless the conduct was "open and notorious" as to amount to a "public nuisance," as defined by the English canon law. *See Cole v. State*, 94 A. 913, 914 (Md. 1915); Torcia, *supra*. The Puritans, however, made adultery with a married woman a capital offense and from this Puritan legacy sprung state laws criminalizing adultery. *See* Jeremy D. Weinstein, Note, *Adultery, Law, and the State: A History*, 38 Hastings L.J. 195, 225-26 (1986). Even today, there are jurisdictions which

continue to outlaw extramarital acts.[3] The fact that adultery is no longer illegal in the Commonwealth of Kentucky does not establish that such conduct is a fundamental liberty protected by the Constitution.[4] Based on the historical treatment of adultery, a right to engage in an intimate sexual relationship with the spouse of another cannot be said to be either deeply rooted in this Nation's history and tradition or implicit in the concept of ordered liberty. Thus, following the Supreme Court's decision in *Bowers*, we decline to accord Marcum's adulterous relationship the constitutional protection afforded those intimate associations which receive protection as a fundamental element of personal liberty.

Relying on both the language and spirit of *Bowers*, the court in *Mercure v. Van Buren Township*, 81 F. Supp. 2d 814 (E.D. Mich. 2000), held that the constitutional protections of the First and Fourteenth Amendments, embodied in the right of intimate association, did not extend to a police officer's adulterous relationship with the wife of a fellow officer; thus, there was no liability under 42 U.S.C. § 1983 for his discharge. *See Mercure*, 81 F. Supp. 2d at 825. The district court found *Mercure* to be "both informative and persuasive albeit not binding precedent." Marcum argues that in *Mercure* the officer's relationship with the wife of a fellow officer distinguishes it from the present case. Additionally, he seeks to distinguish *Mercure* based on the fact that the court discussed that Michigan law makes adultery a felony, whereas it is no longer illegal in Kentucky.

As discussed by the district court, Marcum's efforts to distinguish *Mercure* do not succeed. The fact that the plaintiff's relationship in *Mercure* was with the wife of a

---

[3] *See, e.g.*, Ariz. Rev. Stat. § 13A-1408-1409; Fla. Stat. § 798.01; GA. Code Ann. § 16-6-19; Kan. Stat. Ann. § 21-3507; Mich. Comp. Laws § 750.30; N.C. Gen. Stat. § 14-184; R.I. Gen. Laws § 11-6-2; S.C. Code Ann. §§ 16-15-60, 16-15-70; Wis. Stat. Ann. § 944.16.

[4] Ky. Rev. Stat. § 436.070, making adultery a criminal offense in the Commonwealth, was repealed in 1974.