**F. Chris CAWOOD, Plaintiff,**

v.

**David HAGGARD, et al., Defendants.**

**No. 3:00–CV–272.**

United States District Court,
E.D. Tennessee.

Feb. 11, 2004.

F.C. Cawood, Kingston, TN, Pro Se.

Dan C. Stanley, Knoxville, TN, for Plaintiff.

John C. Duffy, Robert H. Watson, Jr., Watson & Hollow, PLC., Knoxville, TN, Martha A. Campbell, Nashville, TN, for Defendants.

## MEMORANDUM OPINION

VARLAN, District Judge.

This civil rights case arises from the plaintiff's indictment, arrest and prosecution in Roane County, Tennessee, for promoting and patronizing prostitution. Plaintiff is an attorney in Kingston, Tennessee, who became intimately involved with one of his clients, Tammy Clark, whom he represented in a divorce action. Ms. Clark complained to local authorities that she was, in effect, asked to participate in sexual activities with the plaintiff as a quid pro quo for a reduction in her legal fees. With her consent, Ms. Clark was wired with audio and video recording equipment and her meetings with plaintiff on May 10 and 18, 1999, were recorded. The recordings were used by authorities to prosecute the plaintiff. Plaintiff asserts that the surreptitious recording, publication of the videotape, and subsequent prosecution constituted various violations of federal and state law. The defendants are the Roane County Sheriff and employees of the Sheriff's Department in their individual and official capacities.

This civil action was filed May 8, 2000, and has been intricately connected with the criminal proceedings against plaintiff in state court. The plaintiff was indicted by a Roane County grand jury on June 21, 1999 on two counts of promoting prostitution and two counts of patronizing prostitution. Plaintiff was convicted by Roane

County Circuit Court Judge Buddy D. Perry of two counts of attempt to patronize prostitution, a Class C misdemeanor.[1] Plaintiff's conviction was overturned by the Tennessee Court of Criminal Appeals on February 25, 2002.[2]

As set forth in the Amended Complaint [Doc. 4],[3] plaintiff has alleged the following claims: (1) violation of 42 U.S.C. § 1983 for invasion of privacy; (2) violation of § 1983 for unreasonable search; (3) violation of § 1983 for conspiracy to injure plaintiff's reputation; (4) defamation; (5) malicious prosecution; (6) abuse of process; (7) public disclosure of private facts; (8) intrusion into seclusion; and (9) outrageous conduct.

The defendants[4] have filed a comprehensive motion for summary judgment [Doc. 81] with supporting briefs and documentation [Docs. 84, 88, 101]. The plaintiff has likewise thoroughly briefed the issues regarding summary judgment [Doc. 103]. The Court has carefully considered the briefs and supporting documents, as well as the arguments of counsel presented on November 12, 2003. For the reasons set forth herein, defendants' motion for summary judgment will be **GRANTED** whereby all federal causes of action against the defendants will be dismissed with prejudice and all state law causes of action will be dismissed without prejudice.

### I. Defendants' Motion to Strike Deposition Testimony of Andy Kirkland

One pending motion must be addressed prior to the Court's analysis and resolution of the motion for summary judgment. Defendants have filed a Motion to Strike Deposition Testimony of Andy Kirkland [Doc. 100]. The defendants request the Court to strike the deposition testimony of Andy Kirkland, submitted as Exhibit G to plaintiff's response to the summary judgment motion [Doc. 103]. Defendants argue that Kirkland's deposition was taken by plaintiff, acting *pro se*, ostensibly for a state law defamation case against a newspaper, but during which Kirkland was questioned about matters related to the present case. This deposition was taken without notice to the defendants' counsel. The defendants point to this Court's prior ruling that plaintiff could not rely on the deposition testimony of Linda Booth taken under similar circumstances [*see* Doc. 74]. Plaintiff's response [Doc. 105] to this motion is simply that Kirkland has been properly identified as a witness and that there is no legal basis to exclude his testimony merely because it was taken in a collateral lawsuit.

The Court must agree with the defendants for the reasons set forth in its prior order. The defendants' motion will be **GRANTED** and the deposition testimony of Andy Kirkland will not be considered in reviewing the defendants' motion for summary judgment.

1. *See* Tenn.Code Ann. §§ 39–13–514(b)(1); 39–12–107(a).

2. The State of Tennessee's application for permission to appeal was denied by the Tennessee Supreme Court on September 9, 2002.

3. During the pendency of this case, some of plaintiff's claims were dismissed without prejudice while the criminal case was pending. After the Court of Criminal Appeals overturned plaintiff's conviction, then-Magistrate Judge Phillips allowed those claims to be revived [Doc. 54]. Judge Phillips' order, however, did not grant the plaintiff's request to file a second amended complaint, contrary to the perception of the parties.

4. The pending motion was filed by the current defendants: David Haggard, Linda Booth, Jon French, Randy Scarborough, Faye Hall, Sam Bolden, Kenneth Morton, and Dennis Worley, in their individual and official capacities. Two other defendants, Jason Legg and Kristopher Mynatt, have been previously dismissed by stipulation [Docs. 42, 95].

## II. *Relevant Facts*

As the Court is obliged to do in reviewing a motion for summary judgment, the facts of this case will be viewed in the light most favorable to the plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). It is worth noting that, although this case is particularly fact-intense given the number of parties and claims at issue, the facts are largely undisputed. The legal significance of the facts has been vigorously contested.

### A. The Parties

Plaintiff F. Chris Cawood is an attorney and solo practitioner in Kingston, Tennessee. Tammy Clark retained Cawood in August 1998 to represent her in a divorce action. Clark's divorce was granted in February 1999 and she continued to utilize Cawood's services in a post-divorce property dispute throughout the spring of 1999. Clark is not a party to this action.

Defendant David Haggard is the Sheriff of Roane County, a position he has held since 1993. In that position, he supervises the employees of the Sheriff's Department, as well as the employees of the Roane County jail. Defendant Linda Booth was employed during the relevant times as an investigator for the Sheriff's Department and was the lead investigator on Cawood's case. Defendant Dennis Worley is also an investigator for the Sheriff's Department and shared an office with Booth. Worley is also Clark's uncle, *i.e.,* Worley's sister is Clark's mother. Defendants Jon French and Randy Scarborough are also investigators with the Sheriff's Department and share an office which is located in the portion of the building devoted to the jail.[5] Defendant Faye Hall is employed by the Sheriff's Department and supervises the jail. Defendants Sam Bolden and Kenneth Morton are corrections officers at the jail.

### B. The Events Prior to Cawood's Arrest

As previously noted, Clark retained Cawood as her attorney in divorce proceedings for a fee of either $1,650 or $1,750. [Doc. 84, Ex. 5 at p. 86.] Clark paid Cawood $250 initially and thereafter agreed to make monthly payments of $100. [Doc. 84, Ex. 5 at p. 86.] Clark also agreed to execute a trust deed on her home in favor of Cawood to secure the payment of his fee. Clark's divorce was granted on December 10, 1998, but the final decree was not entered until February 1999.

At some point during the attorney-client relationship, plaintiff and Clark began a sexual relationship. The exact length of time during which such activities occurred and the type of activities engaged in is somewhat in dispute between plaintiff's and Clark's testimony.[6] It can, however,

---

**5.** The Sheriff's Department offices and the Roane County Jail apparently occupy the same building. The office utilized by French and Scarborough is physically located in the jail portion of the building, although it is accessible from the Sheriff's Department offices and is technically part of the Sheriff's Department.

**6.** Plaintiff testified that he and Clark began a romantic/sexual relationship that lasted from at least December 1998 through May 18, 1999. [Doc. 84, Ex. 5 at pp. 99, 114.] Clark testified that the sexual activity occurred on

only two occasions prior to the visits of May 10 and 18, 1999, which were recorded. [Doc. 84, Ex. 6 at p. 28.] Cawood testified that the activities that occurred on May 10 and 18 had occurred previously, while Clark claims that those dates were the first time she hit him with a belt. [Doc. 84, Ex. 5 at pp. 114, 118, Ex. 6 at p. 24.] Cawood described their relationship as, "I just know from time to time we had sexual relations—type relations that she wanted to go further and be like a girlfriend for me to go out and date, and I wasn't ready for that." [Doc. 84, Ex. 5 at pp. 107–108.] In contrast, Clark testified that she was not

safely be stated that Cawood and Clark engaged in activities of a sexual nature during the course of Cawood's representation of Clark and that their liaisons took place in his law office. Cawood asserts that the romantic activities began by at least December 1998. The relationship escalated in January 1999 when he performed oral sex on Clark. He contends that she made a $100 monthly payment during that visit. All other sexual activities occurred during February through May 1999, during which Cawood masturbated while Clark pinched his nipples and/or hit him with a belt.[7] [Doc. 84, Ex. 5 at pp. 107–111.] On at least two of these occasions, Cawood credited Clark's account without Clark making a payment. [Doc. 84, Ex. 5 at pp. 110–111, 118.][8]

At some point after the relationship turned intimate, Clark complained about Cawood's actions to the Honorable Dennis W. Humphrey, a General Sessions Court Judge for Roane County. Judge Humphrey referred Clark to the District Attorney's ("DA") office and she was in turn referred to defendant Booth. Booth testified that she received a call from Assistant DA Roger Delp who gave her Clark's name and number and requested that Booth investigate a complaint of inappropriate sexual activity by a local attorney. Clark relayed her complaints to Booth, namely that Cawood deducted amounts from her bill after engaging in sex acts and she speculated that what Cawood was doing was wrong and perhaps criminal.[9] [Doc. 84, Ex. 6 at pp. 22, 26.] Clark apparently told Booth that "I've been doing some things with him but that he was getting weird and wanting her to come after hours and she was afraid. . . . And she said it's just not right." [Doc. 84, Ex. 6 at pp. 78.] Clark claimed that she was trying to get her property back and had already paid Cawood and did not want to go to another attorney. Clark admitted that she had voluntarily participated in the sexual acts, but she was having financial problems and felt forced to go back to Cawood.

Booth assumed the complaint to be valid and worth investigating since it had been referred to her by both a judge and the DA.[10] Booth admits that she was not sure

---

having an affair with Cawood and that she had never kissed him. [Doc. 84, Ex. 6 at p. 20.] For purposes of summary judgment, the Court will assume plaintiff's version of the facts to be true and, in any event, the Court does not view these disputed facts as material to the resolution of plaintiff's claims.

7. Cawood testified that Clark asked to come to his office on May 10 and May 18 for the purpose of engaging in those activities. [Id. at p. 114.] Clark testified that she hit him with the belt during the May 10 and May 18 visits "[b]ecause I figured people wouldn't believe what he was doing behind closed doors." [Doc. 84, Ex. 6 at p. 44.]

8. Cawood testified, "I know I credited her account two times. I'm not sure of the exact dates. We had engaged in this conduct for several times, three, four, before she asked for, making it worth her while, was the way she termed it. I should get something out of this." [Doc. 84, Ex. 5 at p. 111.] However, Cawood also claimed that the sexual activities

and the reductions to Clark's fee "weren't quid pro quo. They weren't connected." [Id.] At Cawood's criminal trial, however, Clark testified that Cawood told her "he did not want to have sex with me. He just wanted to watch, or for me to watch him, and again that he would knock $100 off my bill if I would sit and watch him." [Doc. 84, Ex. 7 at p. 15.] .

9. Despite this speculation, Clark could not definitively say what criminal acts Cawood had committed. When questioned as to what Cawood had done that was illegal, Clark could only say "[t]he man ain't right." [Doc. 84, Ex. 6. at p. 26.]

10. Booth testified that Judge Humphrey later contacted her to see if she had spoken with Clark and to ensure that her complaint was being investigated. Booth acknowledges that the only step she took to investigate the veracity of Clark was to ask her office mate and co-defendant Worley about Clark. He reportedly advised Booth that Clark "was a good girl."

what offense Cawood had committed.[11] [Doc. 84, Ex. 8 at p. 90.] Booth advised Sheriff Haggard about the referral of Clark by the DA and the information she had obtained from Clark. Sheriff Haggard advised Booth to get the evidence on videotape "[b]ecause you can't argue with a videotape." [Doc. 84, Ex. 8 at p. 114.] Booth also consulted with the DA's office and related the information from Clark and that the sheriff wanted the acts videotaped. She also advised the DA that she had contacted the Tennessee Bureau of Investigation, which had a purse with a camera in it, and that they planned to equip Clark with the purse and audio surveillance equipment. The Assistant DA, Frank Harvey, advised Booth to proceed with the investigation and see what evidence she could get and they would decide on charges afterwards.

Clark agreed to assist Booth in investigating Cawood's conduct. Clark agreed to wear an audio transmitter and carry the purse with a video camera to her next appointments with Cawood, which occurred on May 10, 1999, and May 18, 1999.[12] Clark testified that she was not given any instructions from Booth or the other officers to do anything other than what she would normally do. [Doc. 84, Ex. 6 at pp. 23, 52.]

At the May 10 visit, Clark successfully made an audio recording of her meeting with Cawood, but the video recording did not work. After the video failed to work on the May 10 visit, Booth again consulted with the sheriff who suggested they try again to get a video. During the May 18 appointment, Clark obtained both an audio and a video recording of her meeting with Cawood. On both occasions, Cawood engaged in the usual sexual activities after which he deducted money from her bill.[13] [Doc. 84, Ex. 8 at p. 145–46.] Cawood admits that he voluntarily participated in the sexual activities with Clark and voluntarily allowed her into his office. [Doc. 84, Ex. 5 at p. 140.] As the lead investigator in Clark's case, Booth retained possession of the recordings. Sheriff Haggard testified that the normal procedure for handling evidence is for the investigating officer to retain possession of any evidence, to store the evidence properly and that it "can only be viewed by those who have a need to in the case." [Doc. 103, Ex. J at p. 41.]

Booth conveyed the results of her investigation to Assistant DA Harvey, who presented the case to the grand jury. Booth testified before the grand jury pursuant to subpoena. Cawood was indicted by the grand jury on June 21, 1999 on two counts of promoting prostitution and two counts of patronizing prostitution. [Doc. 84, Ex. 1.] Cawood was arrested on the morning of June 24, 1999.

[Doc. 84, Ex. 8 at pp. 156–57.] It appears this conversation took place sometime before the surveillance activities on May 10 and May 18, 1999.

11. Jon French, who assisted Booth with the investigation, also did not know what charges could be levied against Cawood, but speculated the acts could be extortion. [Doc. 84, Ex. 11 at p. 15.] Sheriff Haggard apparently had a similar perception of the case, that is, that Cawood could be charged with coercion or extortion. Haggard claims that he relayed his opinion to Booth. [Doc. 103, Ex. J at p. 39–40.]

12. Cawood does not dispute that Clark voluntarily agreed to be wired and carry the purse with the video camera. [Doc. 84, Ex. 5 at p. 144.]

13. Cawood claims that the sexual activities that occurred on May 10 and May 18 were different from previous encounters because Clark did not disrobe at all, "which should have been some clue to me." [Doc. 84, Ex. 5 at p. 117.] He further testified, "the difference was, was her constantly asking for money, for a money deal . . . . it was like she wanted a contract or something." [Id. at p. 138.]

Bolden was working in the jail the day Cawood was arrested. When he saw Cawood brought into the jail, Bolden asked Captain Hall to be excused from contact with Cawood during the booking process because he had known Cawood all of his life and thought it would be uncomfortable. Captain Hall agreed that the situation would be uncomfortable for both Bolden and Cawood, so she had other jailers process Cawood. Because the grand jury was present to tour the facility at the same time that Cawood arrived to be booked, Hall directed that Cawood be processed in her office for privacy. Cawood was processed in fifteen (15) or twenty (20) minutes and then released.

Booth prepared a statement which was released to the press after Cawood's arrest on June 24, 1999. The press release stated as follows:

FORMER STATE REPRESENTATIVE ARRESTED ON PROSTITUTION CHARGES

Kingston attorney F. Chris Cawood was arrested today on prostitution charges on an indictment handed down by the Roane County Grand Jury yesterday. Two counts of Promoting Prostitution and two counts of Patronizing Prostitution against Cawood was presented to the Grand Jury June 23 by Roane County Criminal Investigator Linda Booth and a True Bill was handed down.

Cawood was arrested at his office on N. Kentucky St., Kingston and brought to the Roane County Jail by Investigator Jon French and Deputy Bobby Anderson. Cawood is free on $2500 bond.

[Doc. 84, Ex. 19.] Cawood admits that the press release does not contain false facts, but he apparently contends that because the charges themselves were false, the publication of those charges was also false. [Doc. 84, Ex. 5 at pp. 207, 209.]

## C. The Events Following Cawood's Arrest

Four days after his arrest, on June 28, 1999, Cawood held a press conference on the steps of the Roane County courthouse in Kingston, Tennessee, during which he advised the news media of the existence of a videotape involving masturbation. The pertinent portions of Cawood's statement are as follows:

I will be entering a plea of not guilty to the charges lodged against me because I am not guilty of criminal conduct.

This whole thing is not about patronizing a prostitute as I am charged. If it were, they would have arrested the prostitute also. And by the way, who are they claiming is the prostitute? I didn't believe Tammy Brooks (shown on the indictment as Tammy Clark) was a prostitute when she asked to come into my office. I still don't believe she is. If anybody made her into a prostitute it was the sheriff's office and not me. . . .

In most counties, a charge of patronizing a prostitute would result in a citation to court and a small fine.

But no, not here in Roane County. Prostitution and masturbation must be a high priority. Instead of issuing a warrant for my arrest and giving me a preliminary hearing where I could present evidence and cross-examine witnesses, the cowards took it to the Grand Jury where the defendant is not notified and does not present evidence.

At 10 a.m. Thursday morning, I was here in the courthouse. All the sheriff's office would have had to do was to tell me to walk across to the jail that they had an indictment for me. Or they could have called me at my office and I would have turned myself in.

No. They came to my office, acted like I was a murderer or something, and put me in the back of a patrol car. That was cheap and cowardly.

This was a set-up. But they didn't get what they wanted....Why a wire and a hidden video camera? ... They had spent so much of the county and state taxpayers' money and they wanted to embarrass me so badly, that they charged me with patronizing prostitution. And there has to be a prostitute in order to patronize prostitution (the one they sent in to entice me—this Tammy Brooks or Tammy Clark, whatever she goes by. If she was in the business of being a prostitute, I didn't know it and I still don't know it).

Well, she didn't have sexual relations with me and I didn't pay her for sexual relations.

[Doc. 84, Ex. 18.] Cawood also apparently sent out a spoof "warning" to area law enforcement agencies in August 1999, with the heading "Do no (sic) masturbate in Roane County." [Doc. 84, Ex. 20.]

As noted previously, Booth shared an office with defendant Worley, who is Clark's uncle. Although he was not involved in the investigation of Cawood, Worley learned of Clark's involvement with Cawood from Booth. He did not learn of the specific charges against Cawood until after the indictment. Worley's sister apparently asked him to find out if Clark was in trouble, so Worley asked Booth if he could see the video recording made during Clark's May 18, 1999 visit to Cawood's office. For this reason as opposed to any official reason, Booth consented to allow Worley to view the video, which he did on June 24, the afternoon of Cawood's arrest. Worley admits that he was advised by Booth to keep the video secure. [Doc. 103, Ex. E at p. 33.] Sheriff Haggard concedes that it was improper for Booth to allow Worley to view the video. It is important to note that this is the only "public" viewing of the videotape until it was played at Cawood's criminal trial. [Doc. 84, Ex. 5 at pp. 131–32, 242.]

Apparently the only available office with a television/VCR in the Sheriff's Department was the office occupied by defendants Jon French and Randy Scarborough. French provided some assistance to Booth in her investigation, but Scarborough was not involved at all. Both French and Scarborough were in their office and did not leave when Worley watched the videotape.[14] One non-employee, Andy Kirkland, a bondsman, was also present in the office during part of the period when the video was played. Bolden heard that a videotape of Cawood was being played in Scarborough's office and he watched it out of curiosity. Bolden watched a three to four minute portion of the tape and then left.[15] Thus, the video was viewed, in part or in whole, by Worley, French, Scarborough, Bolden and Kirkland.[16] Scarborough acknowledged that at least one comment was made while they were watching the video

14. According to Cawood, he was advised by Chuck Hill, another attorney, that Hill had spoken with French about Cawood's arrest and was told about the videotape. However, Cawood does not know when this alleged conversation took place. [Doc. 84, Ex. 5 at p. 163.]

15. Cawood speculates that Bolden talked about the videotape with a clerk at a Rocky Top market. Cawood learned of this conversation from someone who overheard a "tall deputy" allegedly saying to the clerk, "You ought to see what we have on this attorney in town up at the Sheriff's Office." [Doc. 84, Ex. 5 at p. 176.]

16. Cawood assumes that defendants French, Booth, Worley, and Scarborough disseminated the contents of the videotape because "the information mushroomed." [Doc. 84, Ex. 5 at p. 231–32.]

which prompted Worley to respond to the effect, "that's my niece; let's hold it down." [Doc. 103, Ex. F at p. 39.] Several witnesses testified that the video was a topic of conversation in the hallway outside French's office; however, no one has definitively testified as to who was talking about the video in the hallway or what was being said. It is undisputed, however, that employees of the Sheriff's Department as well as members of the community soon learned of the nature of the videotape and that it was a popular topic of conversation.

Cawood's complaint related to Hall is that as supervisor of the jail, Hall had some authority over what takes place in the jail even though she does not direct or supervise the investigators. Hall had no knowledge of the Cawood investigation prior to his arrival at the jail for booking. Hall was aware through comments of persons in the jail that the videotape was being played in Scarborough's office.

Cawood's complaint related to Morton is based solely on one incident which occurred several months after Cawood's arrest. Apparently Morton spoke with a former jailer, Faye Humphreys, at a local grocery store and wondered how Cawood could deny the charges against him when a videotape existed.[17] Morton testified that Humphreys asked what was on the video and he told her what he had heard about it. [Doc. 84, Ex. 15 at p. 16.] Humphreys testified that Morton told her he had seen the video and he jokingly suggested that she hire Cawood to sue the Sheriff's Department over her termination and per-

haps she could get a spanking discount. [Doc. 84, Ex. 16 at pp. 20–21.] It is undisputed that this event occurred several months after Cawood's arrest and that the existence of a videotape showing Cawood engaged in sexual activity was well known in the community. It is also worth noting that Morton did not convey any information to Humphreys that she did not already know.

Clark filed a complaint dated April 30, 1999, with the Tennessee Board of Professional Responsibility concerning Cawood's conduct. [Doc. 84, Ex. 21.] Cawood agreed to a public censure, entered March 26, 2001, for violating Disciplinary Rule 5–101(A)[18], in which he was found guilty of a conflict of interest arising from his personal relationship with Clark. [Doc. 84, Ex. 22.] The Board did not find any indication that the quality of Cawood's representation of Clark had been diminished as a result of the conflict of interest.

The record contains copies of three letters that Cawood sent to Clark following his arrest. [Doc. 84, Exs. 23, 24, 25.] The July 12, 1999 letter threatens foreclosure on Clark's home to begin in August 1999 if she does not make scheduled payments on her account. [Id., Ex. 23.] The October 29, 1999 letter asks Clark to be a witness for Cawood in the instant case and offers "to reimburse you for your expenses and time missed from work in preparing this case to the highest legal limit." [Id., Ex. 24.] In the December 22, 1999 letter, Cawood suggests that Clark may also have

---

17. Morton apparently learned of the existence of the videotape by overhearing a conversation between Kirkland and a Sergeant Kirby who works for the Sheriff's Department, but Morton has never watched the videotape. [Doc. 84, Ex. 15 at pp. 10–11, 13.]

18. At the time of Clark's complaint and Cawood's censure, the Code of Professional Responsibility contained the rules governing the conduct of licensed attorneys in Tennessee pursuant to Tenn. S.Ct. R. 8. Disciplinary Rule 5–101(A) stated, "Except with the consent of the client after full disclosure, a lawyer shall not accept employment if the exercise of professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests."

a claim against the Sheriff's Department and that her claim "should be worth about $250,000." He further suggests that she hire a Knoxville attorney to assist her and that their counsel work together so they "both can come out of this much better off." [*Id.*, Ex. 25.] Cawood claims these letters were written solely for the purpose of collecting a debt, just as he would do to any client with an unpaid bill. He claims these letters were not designed to influence Clark's testimony as a witness. [Doc. 84, Ex. 5 at pp. 247–48.]

## D. The Criminal Proceedings Against Cawood

Booth provided the evidence of her investigation to Assistant DA Harvey and the DA's office made the decision on what the charges would be and that they would be taken to a grand jury. Cawood admits that the DA's office was responsible for determining the charges on which he was indicted. [Doc. 84, Ex. 5 at pp. 213–14.] He further admits that Booth's testimony before the grand jury was pursuant to subpoena. [Doc. 84, Ex. 5 at p. 78.] He contends, however, that although the process is legal, the defendants were "cowardly" to bring the charges against him before a grand jury as opposed to proceeding to a preliminary hearing. [Doc. 84, Ex. 5 at p. 219.] Following the indictment, a DA from Rhea County, District Attorney General J. Michael Taylor, prosecuted the case against Cawood in the Roane County Circuit Court.

During the course of the criminal proceedings, Cawood filed a motion to suppress the videotape as evidence on the following grounds: (1) the search was without a warrant, in the absence of exigent circumstances, and without the consent of Cawood; (2) the search was the product of unlawful wiretap activity; (3) the search violated Cawood's reasonable expectation of privacy and confidentiality of communications within his law office;

and (4) the search was conducted without probable cause because the information was inadequate and came from an informant whose veracity was known to be unreliable. [Doc. 84, Ex. 2.] In a memorandum opinion, Roane County Circuit Judge Perry denied the motion to suppress and held that there was no Fourth Amendment violation in Clark's recording of Cawood's activities. Judge Perry further held that the video tape was admissible despite the improper disclosure of the video to Worley and others. [Doc. 84, Ex. 3 at p. 3.]

Following a bench trial, Cawood was convicted of two counts of attempting to patronize prostitution. He appealed that conviction and the Tennessee Court of Criminal Appeals reversed the trial court's judgment and dismissed the charges against Cawood. [Doc. 84, Ex. 4.] The opinion contained the following pertinent discussions:

> The State argues in its brief that the Defendant attempted to hire Ms. Clark with the intent that she engage in sexual activity as a business, i.e., with the intent that Ms. Clark engage in sexual activity in exchange for monetary compensation in the form of deductions from her outstanding balance owed for legal services. Although the term "business" is not defined in the definitions section of our criminal code, "business" is defined in The American Heritage Dictionary of the English Language as "[t]he occupation, work, or trade in which a person is engaged or a specific occupational pursuit." The American Heritage Dictionary of the English Language (4th ed.2000). As the Defendant argues in his brief, both Ms. Clark and the Defendant denied that Ms. Clark was a prostitute or in "business" as a prostitute. There was no evidence that she in

any way pretended to be a prostitute. There was no testimony from any witness characterizing Ms. Clark as a prostitute. Perhaps more importantly, the record is void of any evidence that Ms. Clark engaged in or offered to engage in sexual activity as a business. There is no evidence that the Defendant attempted to solicit or hire Ms. Clark with the intent that Ms. Clark engage in sexual activity as a business. The dictionary definition of "business," and for that matter the "common sense" definition of business, does not, in our view, include the type of sexual activity that occurred between the Defendant and Ms. Clark. Even considering the evidence in the light most favorable to the State, that is, that the Defendant attempted to solicit or hire Ms. Clark with the intent that Ms. Clark engage in prostitution (which by definition would require Ms. Clark to engage in sexual activity as a business), we cannot conclude that the Defendant's intent to credit Ms. Clark's account after each act involving "sexual relations" would result in Ms. Clark's engaging in sexual activity as a "business." If the sexual activity that occurred between the Defendant and Ms. Clark does not qualify as prostitution, then it logically follows that the Defendant was not guilty of attempting to patronize prostitution.

\* \* \* \* \* \*

Although we have determined that no crime occurred in this case, if we assume that the Defendant did attempt to patronize prostitution under the circumstances presented by the evidence in this case, we conclude that the Defendant's defense of "outrageous [police] conduct" has merit. In our view, Ms. Clark clearly assisted the Defendant toward the commission of the crime in an active manner. Her conduct was inextricably entwined in the commission of the offense. Further, when we examine the other relevant criteria, the evidence in this case indicates that there was significant participation on the part of the state in the direction and control of the criminal enterprise, and the impact of the State activity was to create the commission of the crime not only on the part of the Defendant, but also on the part of the victim.... Although the use of an undercover agent or paid informant by the government has long been held not to violate a defendant's right to due process, ... we are convinced in this case that the Defendant's right to due process was violated by the conduct of the police. With the unusual factual scenario involved in this case, the police participation constitutes a defense. Therefore, had we determined that the evidence was sufficient to convict the Defendant, we would have nonetheless reversed his conviction because his due process rights were violated.

[Doc. 84, Ex. 4 at pp. 6, 7–8.]

## III. *Standard of Review*

Under Fed.R.Civ.P. 56(c), summary judgment is proper if "the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." The burden of establishing there is no genuine issue of material fact lies upon the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must view the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538

(1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir.2002). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable jury could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of witnesses, and determine the truth of the matter. *Id.* at 249, 106 S.Ct. 2505. Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505.

## IV. *The Parties' Positions*

As set forth in the defendants' motion and briefs, the defendants argue that plaintiff cannot sustain any of the asserted federal causes of action and the Court should therefore decline to exercise supplemental jurisdiction over the plaintiff's state law claims. Because the undersigned agrees that the viability of plaintiff's federal causes of action is the key to this Court's jurisdiction, the following analysis will focus on those claims.

Defendants have put forth the following arguments in support of summary judgment on plaintiff's federal claims [*see* Doc. 81]. Defendants argue that plaintiff's adulterous activities with a client do not fall within any recognized substantive due process right of privacy where the client complained to numerous authorities and then agreed to record their activities on audio and videotape. The audio and video recording did not violate plaintiff's Fourth or Fourteenth Amendment rights because: (a) no warrant is required where a civilian cooperating witness enters a dwelling with the voluntary consent of the suspect; (b) defendants Booth and French had legal grounds and/or probable cause to equip Clark with recording devices where she had complained about plaintiff's activities and where the district attorney authorized the investigation; and (c) there is no federal constitutional due process outrageous police conduct claim or defense in the Sixth Circuit apart from the *mens rea* defense of entrapment and no federal right is implicated by these facts. Plaintiff is collaterally estopped from re-litigating the above-listed constitutional issues because they were litigated in state court through a motion to suppress which was denied by the trial court and was not disturbed by the Court of Criminal Appeals. The defendants cannot be liable under a theory of unconstitutional "malicious prosecution" where the district attorney charged and prosecuted plaintiff, and probable cause existed to prosecute the plaintiff as was concluded by two district attorneys general and a state court judge. Cawood cannot establish a civil rights conspiracy claim. Defendant Booth is entitled to absolute witness immunity to the extent Cawood's claims are predicated upon her testimony as a witness. All defendants are individually entitled to qualified immunity to Cawood's claims because reasonable officers in their respective roles could have believed their actions were lawful. Any alleged violation of plaintiff's constitutional rights predicated on the use of Clark as a wired informant or the prosecution of plaintiff was taken pursuant to the direction and supervision of the district at-

torney general and no actions were taken pursuant to a policy or custom of Roane County or the Roane County Sheriff's Department.

In response [Doc. 103], plaintiff makes the following arguments against summary judgment. Plaintiff asserts that his federally protected to right to be free from unreasonable searches and seizures under the Fourth Amendment was violated. Plaintiff's federally protected right to be free from malicious prosecution under the Fourth Amendment was violated. Plaintiff's federally protected right to privacy was violated. The violation of plaintiff's constitutional right to due process constituted outrageous police conduct. Roane County is liable for unconstitutional policies and procedures. Defendants Haggard and Hall are liable under a failure to train theory. The individual defendants are not protected by qualified immunity. Plaintiff is not collaterally estopped to pursue the constitutional claims against the defendants. Notably, while plaintiff argues against the entry of summary judgment, he does not specify what disputed material facts would preclude the entry of summary judgment.

## V. *Analysis*

■ The defendants have asserted the plaintiff cannot prove the constitutional claims as alleged and, even if plaintiff could assert a constitutional claim, the defendants are entitled to the defense of qualified immunity. The defense of qualified immunity is available to "government officials performing discretionary functions, [who] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Claims of qualified immunity are assessed on a fact-specific basis to ascertain wheth-

er the particular conduct of the defendant(s) infringed on a clearly established federal right of the plaintiff, and whether an objective, reasonable officer would have believed that his conduct was lawful under extant federal law. *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The Court must therefore first determine whether a clearly established statutory or constitutional right has been violated. *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir.1998); *see Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (the court must consider whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right."). If so, then the Court must ask whether a reasonable public official would have understood that their actions were in violation of that clearly established right. *Bloch*, 156 F.3d at 678; *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996); *see Saucier*, 533 U.S. at 202, 121 S.Ct. 2151 ("whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted").

Thus, with respect to plaintiff's federal claims, the Court must look to see whether plaintiff has asserted a clearly established constitutional right, whether that asserted right has been violated, and then, if necessary, whether the actions in violation of said right were such that a reasonable officer would have known he was violating those rights.

### A. Invasion of Privacy

As set forth in the Amended Complaint, Count One alleges an invasion of privacy in violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the U.S. Constitution. Plaintiff claims that the surveillance of his activities, the failure

to secure the audio and video recordings, and the "publication" of the video to third parties all constituted unconstitutional invasions of his privacy. [Doc. 4 at ¶¶ 28–42.] The defendants assert that plaintiff's actions do not fall within any recognized substantive due process right of privacy in light of Clark's complaint to law enforcement authorities. The Court will address these arguments as to both the surveillance and the publication of the videotape.

### 1. *The investigation of Cawood*

■ Viewing the facts in the light most favorable to the plaintiff, the first question is whether Cawood's consensual, albeit adulterous, sexual activities with Clark in the confines of his private office fall within a right of privacy that is constitutionally protected from government intrusion. The parties have vigorously contested this point. The defendants cite to numerous cases which indicate that such conduct almost certainly did not fall within a recognized right of privacy prior to the Supreme Court's recent opinion in *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (June 26, 2003), and that *Lawrence* does not extend to the conduct at issue in this case. Plaintiff, of course, argues that *Lawrence* clearly provides for a right to privacy as to consensual sexual conduct between adults. After a careful review of the current caselaw and consideration of the unique facts of this case, the Court must agree with defendants.

The courts have recognized an associational right to privacy that may attach to certain personal relationships. In *Marcum v. McWhorter*, 308 F.3d 635 (6th Cir. 2002), the Sixth Circuit reviewed whether the intimate relationship and cohabitation between the plaintiff and a married woman was entitled to such constitutional protection. After reviewing the Supreme Court precedents of *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), and *Board of Directors*

*of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987), the *Marcum* Court noted that "[w]hile there are relationships other than those between family members that may be afforded constitutional protection, it does not follow that *any* relationship that could be objectively qualified as 'intimate' should be protected." 308 F.3d at 640. The Sixth Circuit concluded that "the adulterous nature of the relationship does not portray a relationship of the most intimate variety afforded protection under the Constitution." *Id.* The *Marcum* decision relies heavily on the reasoning of *Bowers v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), in which the Supreme Court rejected the proposition that "any kind of private sexual conduct between consenting adults is constitutionally insulated from state proscription" and held that there was no fundamental right for homosexuals to engage in consensual acts of sodomy. 478 U.S. at 191–192, 106 S.Ct. 2841. *Marcum* concluded:

> Based on the historical treatment of adultery, a right to engage in an intimate sexual relationship with the spouse of another cannot be said to be either deeply rooted in this Nation's history and tradition or implicit in the concept of ordered liberty. Thus, following the Supreme Court's decision in *Bowers*, we decline to accord Marcum's adulterous relationship the constitutional protection afforded those intimate associations which receive protection as a fundamental element of personal liberty.

308 F.3d at 642.

As the parties' briefs have highlighted, the Supreme Court has recently overruled *Bowers* by virtue of *Lawrence v. Texas*, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (June 26, 2003). Both parties have highlighted portions of the *Lawrence* opin-

ion which they argue support their position. The narrow holding of *Lawrence* declared that a Texas criminal statute prohibiting sexual intercourse between persons of the same sex was unconstitutional per the due process clause of the Fourteenth Amendment. 123 S.Ct. at 2484. The Court also determined that *Bowers* should be overruled. In conclusion, the Court stated:

> The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution. It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter. The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle. The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government.

> 'It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter.' ... The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual.

123 S.Ct. at 2484.

The defendants argue that, although *Lawrence* overruled *Bowers*, the fundamental holding of *Marcum* is still valid and, indeed, the concurring opinion of *Marcum* may now be regarded as the controlling Sixth Circuit law.[19] Plaintiff argues that *Lawrence* recognizes a constitutional protection for all private sexual conduct and therefore his relationship with Clark should be entitled to constitutional protection from governmental intrusion.[20] The Court need not resolve this debate as to the scope or intent of the Supreme Court's opinion in *Lawrence*. Instead, the Court finds that the unusual, but significant, facts of this case compel the conclusion that Cawood did not have a protectable privacy interest in his sexual activities with Clark.

In the present case, the facts reveal that Cawood and Clark began a romantic or sexual relationship that grew from the attorney-client relationship. The facts also reveal that at some point the sexual rela-

---

19. Judge Clay authored a thoughtful concurring opinion in *Marcum* in which he opined that "while relevant in making such a determination, the adulterous nature of the relationship alone should not be dispositive" as to whether the relationship should be afforded constitutional protection. *Marcum*, 308 F.3d at 644. Judge Clay noted that "[t]here is a broad spectrum of relationships between those that are most likely entitled to constitutional protection from state interference, such as close family relationships, and those that are not.... To determine whether a particular association is sufficiently personal or private to warrant constitutional protection, courts must consider size, purpose, selectivity, and

whether others are excluded from the critical aspects of the relationship." *Id.* at 643. He further concluded, "[a]lthough such protection is extended beyond familial relationships, thus far the [Supreme] Court has nevertheless indicated that the relationships most likely to warrant such protection are those that involve *'deep attachments and commitments'* in which one shares, among other things, those 'personal aspects of one's life.'" *Id.* at 646.

20. As Cawood testified, "your sexual life is your innermost secret type thing that you want to keep private. That's why we wear clothes...." [Doc. 84, Ex. 5 at p. 207.]

tionship became unacceptable to Clark and she complained to law enforcement authorities that she believed his actions were criminal. Clark also filed a complaint regarding Cawood's actions with the Tennessee Board of Professional Responsibility. Thus, Clark's complaint is the key distinction between this case and *Lawrence.* Through her complaint of possible criminal activity, Clark *invited* the State's intrusion into this private relationship. Clark's complaint to Booth indicates that her continued participation in sexual activities with Cawood was no longer completely consensual. This factor, along with the adulterous and short-lived nature of the relationship, simply place the relationship outside the realm of constitutional protection. Further, the state's interest in the conduct in *Lawrence* was in the nature of the sexual activity itself. In the present case, the defendants' concern related to plaintiff's apparent request for sexual favors to pay his legal fee; the nature of the sexual activity was beside the point. The Court concludes that Cawood has not asserted the violation of a constitutionally protected right and his claim for invasion of privacy as to the investigation and surveillance must fail on that basis.

■ Assuming that plaintiff's sexual relationship with Clark falls within the boundaries of constitutional protection, the Court would grant defendants summary judgment on the basis of qualified immunity. Plaintiff has not cited, nor has the Court discovered, any controlling authority, which clearly established that such a relationship would be entitled to constitutional protection at the time of the investigation of the plaintiff, which occurred several years prior to the Supreme Court's issuance of the *Lawrence* decision. Accordingly, the Court agrees with defendants that they are entitled to summary judgment based on the defense of qualified immunity.

### 2. *The publication of the videotape*

■ With respect to plaintiff's invasion of privacy claim as to the publication of the video, resolution of that issue is admittedly a closer question. Cawood argues that the publishing of the videotape, *i.e.,* the viewing by Worley and others in the Sheriff's Department and subsequent gossip in the community, is indefensible and that there was no compelling state interest for Worley and others to view the tape. The defendants argue that the publication does not establish a constitutional claim because the conduct was not constitutionally protected in the first instance; there is no evidence of bad motives on the part of the police in viewing the video (Worley was simply concerned about his niece); and, in any event, the defendants are entitled to qualified immunity on this issue.

■ As noted by the Sixth Circuit, "the Constitution does not encompass a general right to nondisclosure of private information." *J.P. v. DeSanti,* 653 F.2d 1080, 1090 (6th Cir.1981). While an informational right to privacy exists, not all disclosures of private information will trigger constitutional protection. The Sixth Circuit has instructed that such claims must be analyzed as: (1) whether the interest at stake is either a fundamental right or one implicit in the concept of ordered liberty; and (2) the government's interest in disseminating the information must be balanced against the individual's interest in keeping the information private. *Id.* at 1090–91; *Bloch v. Ribar,* 156 F.3d 673, 684 (6th Cir.1998). In reviewing the nature of the information at issue, *i.e.,* the video of Cawood and Clark's sexual activities, the Court is constrained to conclude that this information does not rise to the level of a fundamental right or a right implicit in the concept of ordered liberty.

In *Bloch,* the Sixth Circuit reviewed the public disclosure by a sheriff of intimate

details provided by a rape victim about the crime. The Sixth Circuit, in considering the privacy interest of such information, noted:

> Our sexuality and choices about sex, in turn, are interests of an intimate nature which define significant portions of our personhood. Publicly revealing information regarding these interests exposes an aspect of our lives that we regard as highly personal and private.... The fact that the crime of rape occurred in this case implicates both a private and a public interest, but the details of the rape primarily implicate a private interest until such time as the public interest in prosecution predominates. We therefore conclude that a rape victim has a fundamental right of privacy in preventing government officials· from gratuitously and unnecessarily releasing the intimate details of the rape where no penalogical purpose is being served.

*Bloch*, 156 F.3d at 685–86.

The defendants concede that there was no investigational or other official reason for Worley and the other officers to view the surveillance videotape from Cawood's office. While the officers' behavior demonstrates a lack of professionalism at best, it does not rise to the level of a constitutional violation for which § 1983 remedies are available. The video contained not just documentation of Cawood's private sexual conduct, but of his alleged criminal activity in trading sexual favors for a reduction in legal fees. Such suspected criminal acts do not carry with them a corresponding right to confidentiality. Further, the videotape was destined to become public inasmuch as it was evidence to be used, and was in fact used, in the criminal prosecution of Cawood. Finally, while many members of the community may have learned of the videotape by word of mouth, Cawood's press conference in which he publicly confirmed the existence of the videotape and the nature of its contents only added fuel to the fire and likely sparked further interest in the tape. Any privacy interest that existed when the video was viewed by Worley and others was necessarily waived by Cawood's voluntary public statement. Cawood cannot sustain a constitutional claim for invasion of privacy and the defendants shall be awarded summary judgment on such claim.

■ Even if the Court were to conclude that Cawood had stated a constitutional claim for invasion of privacy on these facts, the Court would nevertheless grant defendants summary judgment on the basis of qualified immunity. None of the authorities cited by plaintiff or those reviewed by this Court provide clearly established authority that the officers' actions under these circumstances were unlawful. Again, while the officers' behavior was certainly unprofessional, there is no controlling caselaw to put them on notice that viewing a videotape obtained as evidence in a criminal investigation would violate Cawood's constitutional rights. Thus, the Court agrees with defendants that they are entitled to summary judgment based on the defense of qualified immunity.

## B. Unreasonable Search

Cawood next contends that the defendants violated § 1983 and his constitutional rights under the Fourth and Fourteenth Amendments by conducting an unreasonable search of his office and by recording his activities there. [Doc. 4 at ¶¶ 43–54.] Defendants argue that: (1) no warrant is required where a civilian cooperating witness/informant enters a dwelling with the voluntary consent of the suspect and records suspected criminal activity; (2) Booth and French had legal grounds and/or probable cause to equip Clark with recording devices where she had complained she

was a victim of such activities and the investigation was authorized by the district attorney; and (3) there is no federal constitutional due process outrageous police conduct claim or defense in the Sixth Circuit apart from the *mens rea* defense of entrapment and no federal right is implicated by these facts.

■ Defendants correctly state the well-settled law that an undercover agent or informant may legitimately gain entrance to a residence and gather evidence without violation of the Fourth Amendment. *See United States v. Baldwin,* 621 F.2d 251, 252–53 (6th Cir.1980) ("The Fourth Amendment, however, does not protect wrongdoers from misplaced confidence in their associates....On the contrary, an agent may legitimately gain entrance into a house by misrepresenting his identity."); *United States v. Pollard,* 215 F.3d 643, 648 (6th Cir.2000) ("it is well established that an undercover officer may gain entrance by misrepresenting his identity and may gather evidence while there"). The Court is aware of no authority, nor have the parties cited any, which would alter the application of this well-established principle to the present case. In the present case, Cawood allowed Clark to enter his office with his consent and permission; therefore, he assumed the risk that her presence there was not solely as his client or paramour, but that she was acting as an undercover agent for the Sheriff's Department. Clark's surreptitious surveillance was not an unconstitutional search and Cawood's Fourth Amendment claim must therefore be dismissed.

■ Alternatively, the Court agrees with defendants' assertion that they had probable cause for the investigation and surveillance of Cawood. Cawood contends the investigators did not perform a sufficient background check of Clark to determine her trustworthiness *before* initiating

an investigation of him. Thus, he contends that the investigation lacked probable cause. He relies on the fact that Booth did not know what the elements of prostitution would be. However, Booth had received a complaint from Clark which appeared to be credible, and she had the blessing of the DA and Sheriff Haggard to proceed with the investigation. Booth's inability to place the proper label on Cawood's suspected criminal conduct at the time does not vitiate the probable cause to proceed with the investigation. In opposition, plaintiff relies heavily on the Court of Criminal Appeals' opinion in his case. [*See State v. Cawood,* Doc. 103, Ex. A.] The pertinent part of the opinion on the issue of due process is as follows:

> Although we have determined that no crime occurred in this case, if we assume that the Defendant did attempt to patronize prostitution under the circumstances presented by the evidence in this case, we conclude that the Defendant's defense of 'outrageous [police] conduct' has merit. In our view, Ms. Clark clearly assisted the Defendant toward the commission of the crime in an active manner. Her conduct was inextricably entwined in the commission of the offense. Further, when we examine the other relevant criteria, the evidence in this case indicates that there was significant participation on the part of the State in the direction and control of the criminal enterprise, and the impact of the State activity was to create the commission of the crime not only on the part of the Defendant, but also on the part of the victim....Although the use of an undercover agent or paid informant by the government has long been held not to violate a defendant's right to due process, ... *we are convinced in this case that the Defendant's right to*

*due process was violated by the conduct of the police.*

*Id.* (emphasis added).

Even if the undersigned concurs in the Court of Criminal Appeals' disapproval of the officers' conduct in this case, the opinion of the Court of Criminal Appeals is not binding on this Court in the evaluation of federal constitutional claims. The due process issue was raised as a shield by Cawood in the criminal prosecution; the Court of Criminal Appeals' approval of the use of that defense does not transform it into a sword to prosecute § 1983 claims in this Court. In the absence of controlling precedent, this Court will not create such a cause of action. Defendants will be granted summary judgment on plaintiff's Fourth Amendment claims and they will be dismissed. Alternatively, the Court would grant defendants summary judgment on the basis of qualified immunity as there was no controlling authority which would have alerted defendants that their actions violated plaintiff's Fourth Amendment rights.

One final point is worth noting. Defendants argue that plaintiff is collaterally estopped from asserting the foregoing privacy and unreasonable search claims because those claims were raised and rejected in the criminal case through Cawood's motion to suppress evidence. In light of the Court's ruling on the substantive aspects of plaintiff's claims, the Court need not address this argument.

## C. Civil Rights Conspiracy

Plaintiff also contends that the defendants' actions through the investigation and surveillance of plaintiff constituted a conspiracy to injure his reputation in violation of § 1983 and the Fourteenth Amendment of the Constitution. [Doc. 4 at ¶¶ 55–64.] The factual assertions listed in the Amended Complaint in support of this claim are that: the defendants should have known that plaintiff had due process rights as the subject of a criminal investigation; defendants violated plaintiff's right to be free from unreasonable search by recording him; defendants did not obtain a warrant before conducting a search; and defendants took the case to a grand jury rather than to a preliminary hearing. [*Id.* at ¶¶ 58–62.] Plaintiff's brief in response to defendants' summary judgment motion does not address the civil rights conspiracy claim at all, despite counsel's assertion at oral argument that the claim had not been abandoned.

The Sixth Circuit has outlined the elements of a § 1983 civil rights conspiracy claim as follows:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspirator need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant. It is well settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under § 1983.

*Spadafore v. Gardner,* 330 F.3d 849, 854 (6th Cir.2003) (internal citations omitted). Cawood's testimony of the facts supporting his civil rights conspiracy claim is that:

> ... these defendants [were] involved in the investigation as far as the conspiracy to prosecute me.... They said

that they talked about doing this on at least two occasions. The result was violating my rights.... I think they did it intentionally but I'm not sure that they got together and talked about how they were going to do that, so it may not be an actual conspiracy, just an intentional tort.

[Doc. 84, Ex. 5 at pp. 204–205.]

■ Viewing the facts in the light most favorable to the plaintiff, the Court cannot conclude that plaintiff has sufficiently alleged a claim of civil conspiracy, much less provided facts in support of such a claim to survive summary judgment. The record contains no evidence of a "single plan" among the defendants with a "general conspiratorial objective." Further, plaintiff's own testimony belies his claim. The defendants will be granted summary judgment on plaintiff's claim of civil conspiracy.

In the alternative, as with the previously discussed claims, the Court would grant defendants summary judgment on the basis of qualified immunity.

## D. Malicious Prosecution

Count Five of plaintiff's Amended Complaint asserts a claim of malicious prosecution, although it does not specify whether such claim is under state or federal law. [Doc. 4 at ¶¶ 72–77.] The introductory paragraph of the Amended Complaint states that this action "involves claims arising under 42 U.S.C. § 1983, including invasion of privacy, wrongful search and conspiracy, *as well as other claims which arise under the common law of the State of Tennessee.* ..." [Doc. 4 at ¶ 1 (emphasis added).] Thus, the claim for malicious prosecution is not even identified initially and is not included in the claims specifically listed under § 1983. Further, the malicious prosecution claim is described in the body of the Amended Complaint *after* the § 1983 claims and *after* the first state law claim, defamation, thus suggesting that

malicious prosecution is only alleged as a violation of state law. Although plaintiff's proposed Second Amended Complaint identified the malicious prosecution claim as arising under both federal and state law, that complaint was never filed as discussed *supra* note 3. Accordingly, the Court concludes that the Amended Complaint does not sufficiently state a cause of action under Fed.R.Civ.P. 8(a) for malicious prosecution under federal law.

■ Even if the Court were to read plaintiff's Amended Complaint to include such a claim, the Court must conclude that plaintiff has not presented sufficient evidence to withstand summary judgment. The allegations in support of plaintiff's malicious prosecution claim are that Sheriff Haggard, Booth and French, with the aid of the DA's office, "initiated judicial proceedings" against him, that such proceedings were brought with malice, and that the criminal proceedings ended in a favorable determination for the plaintiff. [Doc. 4 at ¶¶ 73–75.] Although plaintiff acknowledges that the DA's office determined the specific crimes with which to charge Cawood, he also makes much of Booth's testimony that "they told me to charge him with prostitution, *so I did.*" [Doc. 103, Ex. D at p. 200 (emphasis added).]

As the defendants point out in their brief, Sixth Circuit law on constitutional malicious prosecution claims is less than settled. The most recent case to discuss such a claim is *Thacker v. City of Columbus,* 328 F.3d 244, 258–59 (6th Cir.2003). The *Thacker* Court acknowledged the existence of a constitutional claim of malicious prosecution under the Fourth Amendment as previously recognized by *Spurlock v. Satterfield,* 167 F.3d 995, 1005–1007 (6th Cir.1999). Most importantly, the *Thacker* decision provides that "[a]lthough this Court has yet to resolve the elements of a federal malicious prosecution claim, it is

clear that a plaintiff must show, at a minimum, 'that there was no probable cause to justify [his] arrest and prosecution.'" 328 F.3d at 259. Because the plaintiff could not show the absence of probable cause, the *Thacker* Court declined to further outline the elements of a constitutional malicious prosecution claim.

With this guidance, this Court must also conclude that Cawood cannot prevail on a malicious prosecution claim. Cawood admits that the two DA's made the decision to present the evidence against him to the grand jury and then to prosecute. His reliance on Booth's testimony is misplaced. Booth's only actions were to take the evidence from her investigation to the DA for presentation to the grand jury and to testify before the grand jury pursuant to subpoena. Even considering Booth's testimony in the light most favorable to Cawood and assuming that Booth is the person who "charged" Cawood, she did so under the direction of the DA after a review of the evidence. In light of these facts, the Court cannot conclude that Cawood was arrested or prosecuted in the absence of probable cause. The defendants will be granted summary judgment on this claim. The Court further finds that defendants would be entitled to qualified immunity on this claim.

### E. Claims Against Roane County

 Plaintiff's claims, as set forth in the Amended Complaint, are against the defendants in their individual and official capacity. [Doc. 4 at ¶¶ 7–8.] To the extent the defendants are sued in their official capacities, such claims are in essence claims against Roane County. *See Monell v. Department of Social Services of City of N.Y.*, 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent"); *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 556 (6th

Cir.2003) ("A section 1983 action against a city official in his or her official capacity is treated as an action against the City entity itself.") (quoting *Barber v. City of Salem*, 953 F.2d 232, 237 (6th Cir.1992)). Liability under § 1983 may be imposed against a local governmental entity only where a "custom" or "policy" attributable to the governmental entity led to the defendants' unconstitutional conduct. *Monell*, 436 U.S. at 691, 98 S.Ct. 2018.

The plaintiff's theory of liability against Roane County, as described in plaintiff's brief, is "a pattern of unconstitutional actions on the part of the investigators in Roane County, and the appropriate officials have been notified, however no action on the part of the County has taken place." [Doc. 103 at p. 27.] This self-described "inaction theory" is based on Booth's testimony that she does not normally confer with anyone before beginning an investigation and that she never looked up the laws on prostitution before her investigation of Cawood. Cawood also cites to evidence related to various disciplinary actions against Worley and his continued employment by Roane County. [*Id.* at pp. 25–27.] It is undisputed, however, that Worley had no role in the investigation of Cawood.

 Having determined that Cawood cannot sustain any of his constitutional claims against the individual defendants, Cawood likewise cannot sustain a § 1983 claim against Roane County. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) ("neither *Monell* ... nor any other of our cases authorizes the award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm."); *Ewolski v. City of Brunswick*, 287 F.3d 492, 516 (6th Cir.2002); *Smith v. Thornburg*, 136 F.3d 1070, 1078 n. 12 (6th Cir.1998).

Moreover, the facts which Cawood asserts in support of his claim do not in any way comprise a "policy" or a "custom" by which Roane County may be liable under § 1983.[21] Plaintiff's claims against Roane County will be dismissed.

In response to defendants' summary judgment motion, plaintiff also asserts that defendants Haggard and Hall are liable under a failure to train theory. [*See* Doc. 103 at pp. 27–28.] Plaintiff contends that Sheriff Haggard is liable for failing to properly train his employees on securing sensitive evidence. Cawood further contends that Captain Hall is liable under a failure to train theory for failing to stop the viewing of the videotape in French's office.

Despite these vague allegations, plaintiff has no evidence that the defendants' failure to train their employees in a relevant respect constitutes a "deliberate indifference" to the plaintiff's rights such that it could be considered an actionable "policy or custom" under § 1983. *See Shamaeizadeh,* 338 F.3d at 557 (6th Cir.2003) ("only where a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983"). Plaintiff has cited no evidence that Worley's viewing of the videotape was in any way related to a deficiency in training for which Haggard should be responsible. Plaintiff has also failed to cite any evidence that Hall's failure to stop the viewing of the videotape was in any way related to a deficiency in training. This argument is without merit.

### F. State Law Claims

In light of the Court's ruling on plaintiff's federal claims as set forth above, the Court will decline to continue to exercise supplemental jurisdiction over plaintiff's state law causes of action. 28 U.S.C. § 1367(c). Accordingly, plaintiff's claims for defamation, malicious prosecution, abuse of process, public disclosure of private facts, intrusion into seclusion, and outrageous conduct will be **DISMISSED without prejudice.**

### VI. *Conclusion*

For the reasons set forth herein, the Court must conclude that defendants are entitled to summary judgment on plaintiff's federal causes of action and the Court will decline to exercise supplemental jurisdiction over plaintiff's state law claims. Accordingly, defendants' motion for summary judgment will be **GRANTED** and plaintiff's federal claims will be **DISMISSED** with full prejudice. Plaintiff's state law claims will be **DISMISSED** without prejudice. As noted initially, defendants' Motion to Strike Deposition Testimony of Andy Kirkland [Doc. 100] will be **GRANTED.**

In light of the Court's ruling on the defendants' summary judgment motion, Plaintiff's Motion in Limine to Exclude Defendants' Expert Lucian Pera [Doc. 94] will be **DENIED as moot.**

Order accordingly.

---

**21.** A municipal "policy" for purposes of § 1983 requires a "deliberate choice to follow a course of action ... made from among various alternatives by the official or the officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati,* 475

U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). A "custom" that is a basis for a civil rights violation must be "so permanent and well settled as to constitute a custom or usage with the force of law." *Feliciano v. City of Cleveland,* 988 F.2d 649, 655 (6th Cir.1993).